Bernard STROBLE, Petitioner-Appellant,

v.

Charles ANDERSON, Warden, State Prison of Southern Michigan, Respondent-Appellee.

No. 77–1489.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 17, 1978.

Decided Nov. 1, 1978.

---

Ernest Goodman, Neal Bush, Marjory B. Cohen, Mogill, Bush, Posner & Weiss, Detroit, Mich., Haywood Burns, New York City, for petitioner-appellant.

Frank J. Kelley, Atty. Gen. of Mich., Thomas L. Casey, Asst. Atty. Gen., Robert A. Derengoski, Sol. Gen., Lansing, Mich., for respondent-appellee.

Ramsey Clark, ACLU of Mich., Detroit, Mich., for amicus curiae American Civil Liberties Union.

Before PHILLIPS, Chief Judge, EDWARDS, Circuit Judge, and PECK, Senior Circuit Judge.

EDWARDS, Circuit Judge.

It is a requirement of the law of our land that it be enforced in accordance with the procedures contained therein. Justice Felix Frankfurter summarized the justification for this sometimes onerous burden:

"The safeguards of 'due process of law' and 'the equal protection of the laws' summarize the history of freedom of English-speaking peoples running back to Magna Carta and reflected in the constitutional development of our people. *The history of American freedom is, in no small measure, the history of procedure.*" *Malinski v. New York*, 324 U.S. 401, 413–14, 65 S.Ct. 781, 787, 89 L.Ed. 1029 (1945) (emphasis added).

This is the second time this case has been before this court. After the first appellate hearing, we remanded the case to the District Court for resolution of certain additional issues of fact deemed essential to proper resolution. Many of the facts which produce the legal issues with which we deal were set out in our remand opinion:

"Petitioner-appellant perfected this appeal from an order of the district court denying his petition for habeas corpus relief/ . . . . The petition, as does this appeal, represents a collateral attack on his conviction in a Michigan state court of first degree murder.

"So far as they are pertinent to this opinion, the facts established by the record are that while appellant was serving a sentence for an unrelated offense in the State of New York, he was on June 27, 1968, brought back to Michigan pursuant to the Interstate Agreement on Detainers to face charges of assault with intent to commit murder and of first degree murder. He was indicted for both offenses, and a trial concluded on October 8, 1968, on the assault charge, resulted in his conviction of the lesser included offense of

assault with intent to do bodily harm less than murder. Thereafter, a first degree murder trial was scheduled for October 23, 1968, but on October 11, 1968, appellant filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Michigan and the state authorities continued the trial pending a determination of the habeas corpus action. The district court dismissed the habeas corpus petition on November 7th and in a trial conducted from December 16, 1968, to December 20, 1968, appellant was found guilty of first degree murder and sentenced to life imprisonment.

"Following procedures not here material, appellant was returned to New York and then transported back to Michigan, where he is presently serving sentences imposed for the assault and murder convictions in the custody of the respondent-appellee.

"It is concluded that appellant's contention that Michigan waived its right to imprison the appellant on the murder conviction when its authorities returned him to New York after he had begun serving the life sentence in Michigan through administrative mistake is without merit. However, his other contention requires consideration.

"That contention arises out of the fact that the Interstate Agreement on Detainers requires that a person returned thereunder must be brought to trial within a 120 day period, and 173 days intervened between appellant's return to Michigan and the murder trial. The Michigan state court of appeals held that because the delay beyond the 120 day period resulted from appellant's institution of the habeas corpus proceedings, and the trial commenced within a reasonable time after the disposition thereof, the period of limitation had been tolled. The district court agreed with petitioner that the habeas corpus proceeding did not toll the 120 day period, but held that the Interstate Agreement, which it properly found provided a basis for the present attack, was nevertheless not violated because the stay in the proceedings resulted from the granting of valid continuances in the murder trial. It is this determination by the trial court which is particularly under attack in this appeal and which forms the basis for the remand which we conclude to be required.

"In regard to such continuances, appellant strenuously argues that no delay in the murder trial should have been granted except for good cause shown in an open court proceeding, following notification to him, and after affording him an opportunity to be present with counsel. While not presently passing on the legal consequences of such failures (if any occurred), we observe that the present record affords no proper basis for consideration of the issue sought to be raised.

"It is therefore directed that the district court determine on the basis of an evidentiary hearing or otherwise whether the continuances were on the basis of good cause shown after notification and with appellant [or] counsel present. If there was failure to observe one or more of these provisions, the court should then determine whether prejudice to the appellant resulted therefrom, and if not, whether non-prejudicial violation of the Compact nonetheless mandates vitiation of the trial and sentence and dismissal of the indictment.

"Remanded."

*Stroble v. Egeler*, 547 F.2d 339 (6th Cir. 1977).

On remand the District Judge resolved the fact disputes as follows:

"This court has conducted an evidentiary hearing and counsel for the parties have been given a full opportunity to argue the questions involved. The findings of the court follow.

\*     \*     \*     \*     \*     \*

"II. Compliance with Article IV(c) in granting continuances.

　"A. The continuance of October 10, 1968 and the continuance of December 2, 1968 were granted for "good cause" as required by Arti-

cle IV(c) of the Interstate Agreement. When a defendant has been involved in a highly publicized trial lasting for more than a week and ending on October 8, a delay from an October date for the murder trial to December 2, to be certain that a fair trial can be had is for good cause. When the judge to whom the case is assigned is on trial on the day the matter is set for trial, a delay of two weeks to get a judge is for good cause.

"B. The continuances granted on October 10, 1968 and December 2, 1968 were "necessary" and "reasonable" as required by Article IV(c). The delay on December 2 was necessary to be certain that a fair trial could be had, and the time period was reasonable for the same reason, even though a new jury could have been drawn as early as November. The extra month to December 2 provided a reasonable time to permit the publicity surrounding the defendant as a result of the early October trial to subside. The delay from December 2 to December 16 was necessary because the judge to whom the case was assigned was on trial and it was reasonable being only for a period of two weeks.

"C. Neither the continuance of October 10, 1968 nor the continuance of December 2, 1968 was granted in "open court" as required by Article IV(c).

"D. The term "in open court" in Article IV(c) means that there must be a judge present in a courtroom conducting the proceedings in which the continuance is granted.

"E. Compliance with the Article IV(c) requirement of "the prisoner or his counsel being present" is unclear from the evidence presented. The record is clear that the petitioner was not present. It is not clear, however, whether petitioner's counsel was present at the time of the granting of the continuances.

"F. The evidence presented indicates that it is reasonably probable that the defendant or his counsel agreed to the continuances and that these continuances were approved by a judge within a few days of the time the clerk granted them.

"III. Prejudice and dismissal of the indictment under Article IV(e).

"A. The petitioner has shown no prejudice that resulted from the delay in his murder trial.

"B. The Interstate Agreement does not require a showing of prejudice before an indictment must be dismissed for violation of the time provisions of the Agreement."

The District Judge then denied the writ because in his view the 120 day limitation had been "tolled."

"IV. Tolling of the time period because of two separate charges under Article VI(a) of the Interstate Agreement.

"A. The defendant was charged with two different offenses, assault with intent to commit murder and murder, and returned to the state on June 27, 1968 to face both charges.

"B. The trial date for the assault with intent to commit murder charge was set on August 15, 1968 and the trial of the assault charge was begun October 2 and concluded on October 8, 1968. On August 15, 1968, the murder charge was set for trial on October 23, 1968.

"C. A person who is preparing for the trial and on trial on a charge of assault with intent to commit murder is "unable to stand trial" for the second offense from the time the first charge is assigned for trial within the meaning of Article VI(a) of the Interstate Agreement. If the state had attempted to try both charges during this time or had required the defendant to pre-

pare for the trial of these two serious crimes at the same time, prejudice to the defendant would have resulted. This is clearly a reason why under the agreement a person would be "unable to stand trial."

"D. Petitioner was thus "unable to stand trial" under Article VI(a) on the murder charge for 54 days, and the period of time under the Interstate Agreement was tolled for a period of 54 days.

"E. Petitioner's murder trial was commenced on the 173rd day after the arrival of the petitioner in Michigan for prosecution under the Interstate Agreement on two charges; (1) assault with intent to commit murder, and (2) murder, which when reduced by 54 days establishes that the murder trial was commenced within 119 days.

"Accordingly, the petitioner's request for a writ of habeas corpus is denied."

*Stroble v. Anderson,* No. 5–71943 (E.D. Mich. May 6, 1977) at 5–6.

On this appeal appellant argues that this record shows three specific failures on the part of the prosecutor and the court to follow the Interstate Agreement:

1) Failure to try appellant within 120 days.

2) Failure to seek a continuance as provided by the Agreement when appellant sought habeas.

3) Failure, when continuances were granted, to comply with I.A.D.'s requirements of showing of "good cause," "in open court," "the prisoner or his counsel being present."

The state, of course, concedes in this appeal that Michigan did not follow the literal language of the Interstate Agreement on Detainers and try appellant within 120 days. But it resists application of the rigorous sanction (dismissal of the indictment with prejudice) provided by the Agreement. The appellee's claims include:

1) The District Judge was right in holding that appellant was "unable" to stand trial within the meaning of the Agreement.

2) Since the court did docket this continuance, a presumption of knowledge, presence, and agreement with the continuance on the part of defendant and defendant's counsel should be indulged.

3) Failing the above, the writ should still not issue since no "prejudice" to defendant should be found.

Resolution of these conflicting views requires us to turn to the history of the writing and execution of the Interstate Agreement and its approval by the United States.

This court has already examined the history and purposes of the Interstate Agreement on Detainers:

"The Agreement was first promulgated by the Council of State Governments in 1957.[1] It was adopted by Congress in 1970,

[1] Council of State Governments Suggested Legislation 167 (1959).

and 46 states, the District of Columbia and the United States are signatories. The Agreement was designed to facilitate the disposition of charges in one jurisdiction when the accused is incarcerated in another jurisdiction. Some of the reasons for the agreement are set forth in Article I:

"The party States find that charges outstanding against a prisoner, detainers based on untried indictments, informations, or complaints and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. Accordingly, it is the policy of the party States and the purpose of this agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints. The party States also find that proceedings with reference to such charges and detainers, when emanating from another jurisdiction, cannot properly be had in the absence of cooperative procedures. It is the further purpose of this agreement to provide such cooperative procedures."

\* \* \* \* \* \*

"The Agreement is applicable to situations in which one participating jurisdiction has lodged a detainer for a prisoner in another participating jurisdiction where the prisoner is incarcerated. Article III provides that a prisoner can demand to be brought to trial within 180 days on any untried indictment, information or complaint which is the basis for a detainer lodged against him. If the prisoner is not brought to trial within the 180 day limit, the appropriate court of the jurisdiction in which the outstanding charge is pending is required to dismiss the charge with prejudice and the detainer thereupon ceases to have effect. The time limit can be extended for good cause in open court, if either the prisoner or his counsel are present. Thus, Article III provides a prisoner with a procedure for bringing about a prompt disposition of detainers placed against him."

*Ridgeway v. United States*, 558 F.2d 357, 359 (6th Cir. 1977).

The court then said:

"[W]e look to the origins of the Agreement.[5]

"[5] *See generally*, Meyer, Effective Utilization of Criminal Detainer Procedures, 61 Ia.L.Rev. 659 (1976); Yackle, Taking Stock of Detainer Statutes, 8 Loy.L.A.L.Rev. 88 (1975); Dauber, Reforming the Detainer System: A Case Study, 7 Crim.L.Bull. 669 (1971); Wexler & Hershey, Criminal Detainers in a Nutshell, 7 Crim.L.Bull. 753 (1971); Note, Extending the *Smith v. Hooey* Duty to the Holding Jurisdiction, 23 Me.L.Rev. 201 (1971); Note, The Interstate Criminal Detainer and the Sixth Amendment, 23 Ark.L.Rev. 634 (1970); Note, Effective Guaranty of a Speedy Trial for Convicts in Other Jurisdictions, 77 Yale L.J. 767 (1968); Schindler, Interjurisdictional Conflicts and the Right to a Speedy Trial, 35 U.Cin.L.Rev. 179 (1966); Note, Detainers and the Correctional Process, 1966 Wash.U.L.Q. 417; Comment, The Detainer System and the Right to a Speedy Trial, 31 U.Chi.L.Rev. 535 (1964); Note, Convicts—The Right to Speedy Trial and the New Detainer Statutes, 18 Rut.L.Rev. 828 (1964).

A detainer is simply a notice to prison authorities that charges are pending against an inmate elsewhere, requesting the custodian to notify the sender before releasing the inmate. The detainer itself does nothing to affect the prosecution of an inmate. Filing a detainer is an informal process which does not bind the authorities to act.[6] Generally, a penal institution will

"[6] Note, Detainers and the Correctional Process, *supra* note 5, 1966 Wash.U.L.Q. at 417.

recognize a detainer lodged by any person who has authority to take an inmate into custody. In most instances, the prosecutor charged with the task of bringing the case to disposition files the detainer, but, if the case has not yet reached the stage of a formal indictment or information, the detainer may be filed by the police.[7]

"[7] Yackle, Taking Stock of Detainer Statutes, *supra* note 5, 8 Loy.L.A.L.Rev. at 90.

"Detainers have been filed with little consideration of whether the inmate will be brought to trial. In some cases they may be withdrawn as a matter of prosecutorial discretion. Some detainers apparently have been filed for punitive reasons.[8] They are

"[8] Note, Effective Guaranty of a Speedy Trial for Convicts in Other Jurisdictions, *supra* note 5, 77 Yale L.J. at 773.

withdrawn shortly before the inmate's release, having served their purpose by limiting his prison privileges and preventing parole. The dangers in this practice were discussed by Judge Sobeloff in *Pitts v. North Carolina*, 395 F.2d 182, 187 (4th Cir. 1968):

"'Detainers, informal aides in interstate and intrastate criminal administration, often produce serious adverse side-effects. The very informality is one source of the difficulty. Requests to an imprisoning jurisdiction to detain a person upon his release so that another jurisdiction may prosecute or incarcerate him may be filed groundlessly, or even in bad faith, as suspected by the appellant in this case. The accusation in a detainer need not be proved; no judicial officer is involved in issuing a detainer. As often happens, the result of the then unestablished charge upon which the detainer in this case rested was that the detainee was seriously hampered in his quest for a parole or commutation.'

"The effects of a detainer on an inmate can be profound. Extensive delay in bringing the prisoner to trial is only one of the problems. Many prison authorities regard convicts subject to detainers as potential escape risks and, therefore, restrict their

activities and privileges.[9]  An inmate may

"[9] Note, Detainers and the Correctional Process, *supra* note 5, 1966 Wash.U.L.Q. at 419.

be denied institutional privileges resulting in decreased freedom of movement, and he may be precluded from preferred living quarters such as dormitories.[10]  Such an

"[10] Yackle, Taking Stock of Detainer Statutes, *supra* note 5, 8 Loy.L.A.L.Rev. at 91.

inmate may be denied trusty status,[11] or he

"[11] Note, Detainers and the Correctional Process, *supra* note 5, 1966 Wash.U.L.Q. at 419. Sometimes the inmate would be automatically held under maximum security or be declared ineligible for special work programs, athletic programs, release for visits to relatives' death beds, or funerals. *United States v. Ford*, 550 F.2d 732 (2d Cir. 1977).

may be considered ineligible to reside on an "honor farm" or to take part in a furlough program.  Detainers may be taken into account by parole boards and thus may affect the length of a sentence.  A detainer can also have a psychological effect upon an inmate, thus frustrating rehabilitation.  As the Senate Report noted: [12]

"[12] S.Rep.No.91–1356 [91st Cong., 2d Sess. (1970), *reprinted in* [1970] U.S.Code Cong. & Ad.News, at 4866].

" '[W]hen detainers are filed against a prisoner he sometimes loses interest in institutional opportunities because he must serve his sentence without knowing what additional sentences may lie before him, or when, if ever, he will be in a position to employ the education and skills he may be developing.  Although a majority of detainers filed by States are withdrawn near the conclusion of the Federal sentence, the damage to the rehabilitation program has been done because the institution staff has not had sufficient time to develop a sound pre-release program.' "

*Id.* at 360–61.

These problems led to lengthy negotiations between representatives of a number of states and the final drafting of the present agreement.  The provision requiring the receiving state to try the prisoner sent by another state within 120 days, or return him or dismiss the indictment, was a major feature of the agreement designed to make it enforceable.

Although the original effort to draft this agreement came from the states and from private organizations, the United States began to take a strong interest in the matter. Ultimately this led to the United States both joining the agreement as a party on its own behalf and on behalf of the District of Columbia and approving the compact between the states under the provision of art. I, sec. 10, cl. 3 of the United States Constitution which provides:

"No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay."

In *United States v. Mauro*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978), the Supreme Court has defined the purpose of article IV and traced the role of the United States in adopting it.

"The Joint Committee on Detainers was later reconstituted under the auspices of the Council of State Governments.  Then known as the Committee on Detainers and Sentencing and Release of Persons Accused of Multiple Offenses, it held meetings in 1955 and 1956, which resulted in the development and approval of several proposals concerning detainers. Among the proposals was a draft version of the Agreement.  In April 1956 this proposal was reviewed and approved by a conference jointly sponsored by the American Correctional Association, the Council of State Governments, the National Probation and Parole Association, and the New York Joint Legislative Committee on Interstate Cooperation.[17]  Fol-

"[17] Among the 60 persons in attendance at the conference were representatives of the United States Department of Justice.

lowing the endorsement of the Agreement by this conference, the Council of State Governments included it within its Suggested State Legislation Program for 1957.

The Agreement, in the form adopted by the United States and other

member jurisdictions, sets forth the findings upon which it is based and its purpose in Art. I. It notes that "charges outstanding against a prisoner, detainers based on untried indictments, informations, or complaints and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation." Accordingly, its purpose is to encourage the expeditious disposition of such charges and to provide cooperative procedures among member States to facilitate such disposition.

"The central provisions of the Agreement are Art. III and Art. IV. Article III provides a procedure by which a prisoner against whom a detainer has been filed can demand a speedy disposition of the charges giving rise to the detainer. The warden of the institution in which the prisoner is incarcerated is required to inform him promptly of the source and contents of any detainer lodged against him and of his right to request final disposition of the charges. Art. III(c). If the prisoner does make such a request, the jurisdiction that filed the detainer must bring him to trial within 180 days.[18]

[18] For good cause shown in open court, with either the prisoner or his counsel present, the court having jurisdiction over the matter may grant any necessary or reasonable continuance.

Art. III(a). The prisoner's request operates as a request for the final disposition of all untried charges underlying detainers filed against him by that State, Art. III(d), and is deemed to be a waiver of extradition. Art. III(e).

"Article IV provides the means by which a prosecutor who has lodged a detainer against a prisoner in another State can secure the prisoner's presence for disposition of the outstanding charges. Once he has filed a detainer against the prisoner, the prosecutor can have him made available by presenting to the officials of the State in which the prisoner is incarcerated "a written request for temporary custody or availability . . .."[19]

[19] Article IV(a) states:

"*The appropriate officer of the jurisdiction in which an untried indictment, information, or complaint is pending shall be entitled to have a prisoner against whom he has lodged a detainer and who is serving a term of imprisonment in any party State made available in accordance with article V(a) hereof upon presentation of a written request for temporary custody or availability to the appropriate authorities of the State in which the prisoner is incarcerated: Provided, That the court having jurisdiction of such indictment, information, or complaint shall have duly approved, recorded, and transmitted the request: And provided further, That there shall be a period of thirty days after receipt by the appropriate authorities before the request be honored, within which period the Governor of the sending State may disapprove the request for temporary custody or availability, either upon his own motion or upon motion of the prisoner.*"

Art. IV(a).

"Two important limitations, previously referred to, are placed on a prosecuting authority once it has obtained the presence of a prisoner pursuant to Art. IV. Article IV(c) states that

" '[i]n respect of any proceeding made possible by this article, trial shall be commenced within one hundred and twenty days of the arrival of the prisoner in the receiving State, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.'

And Art. IV(e) requires the receiving State to try the prisoner on the outstanding charge before returning him to the State in which he was previously imprisoned:

" 'If trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to article V(e) hereof, such indictment, information, or complaint shall not be of any further *force or effect, and the court shall enter an order dismissing the same with prejudice.*'

Article V(c) similarly provides that the 'indictment, information, or complaint on

the basis of which the detainer has been lodged' shall be dismissed if the prisoner is not brought to trial within the period specified in Art. IV(c)."

*United States v. Mauro, supra* at 1842–43.

Thus Art. IV is unequivocal in its language and so is the interpretation and application of it by the United States Supreme Court.

■ We also believe that the District Judge was in error in holding as a matter of law that the expiration of the 120 day time limit was tolled under Art. VI. Article VI in full reads:

"(a) In determining the duration and expiration dates of the time periods provided in articles III and IV of this agreement, the running of said time periods shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter.

"(b) No provision of this agreement, and no remedy made available by this agreement shall apply to any person who is adjudged to be mentally ill."

Art. VI.

This record does not disclose any determination by the state courts that appellant was "unable" to stand trial. He was in Michigan within the jurisdiction of the trial court and there is no showing in this record that he was physically or mentally disabled. Appellant never sought a postponement of his murder trial because of the fact that it was at one time scheduled to begin two weeks after completion of the assault with intent to murder trial. Neither did the prosecutor. In fact, there is no indication that any judge ever considered any rationale now urged as justification for the violation of the I.A.D.

We believe that Art. VI was written as a protective measure for a transferred prisoner. It cannot appropriately be turned from a shield for the defendant into a sword for the prosecution.

If we were to consider that the District Judge was engaged in a finding of fact in holding appellant "unable to stand trial,"

we would conclude that the finding was unsupported by this record and was clearly erroneous.

The other findings of fact of the District Judge include, "Petitioner's murder trial was commenced on the 173rd day after the arrival of the petitioner in Michigan for prosecution under the Interstate Agreement. . . ." This was, of course, a clear cut violation of Arts. IV(c) and V(c) unless there was a valid continuance.

These articles provide:

"(c) In respect of any proceeding made possible by this Article, trial shall be commenced within one hundred twenty days of the arrival of the prisoner in the receiving state, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance."

Art. IV(c).

"(c) If the appropriate authority shall refuse or fail to accept temporary custody of said person, or in the event that an action on the indictment, information or complaint on the basis of which the detainer has been lodged is not brought to trial within the period provided in Article III or Article IV hereof, the appropriate court of the jurisdiction where the indictment, information or complaint has been pending shall enter an order dismissing the same with prejudice, and any detainer based thereon shall cease to be of any force or effect."

Art. V(c).

As noted above, the District Judge found on remand that:

"Neither the continuance of October 10, 1968 nor the continuance of December 2, 1968 was granted in "open court" as required by Article IV(c).

"The term "in open court" in Article IV(c) means that there must be a judge present in a courtroom conducting the proceedings in which the continuance is granted.

"Compliance with the Article IV(c) requirement of "the prisoner or his counsel

being present" is unclear from the evidence presented. The record is clear that the petitioner was not present. It is not clear, however, whether petitioner's counsel was present at the time of the granting of the continuances."

This record simply does not indicate that the disputed continuances were ever granted "on good cause shown in open court." The record shows no motion for continuance filed by petitioner or his counsel, nor does it show notice to them of such a motion by the prosecution or the court itself, nor does it show that either petitioner or his counsel were present before a judge when the continuances were granted or ever subsequently agreed to them. The District Judge's statement that "it is reasonably probable that the defendant or his counsel agreed to the continuances" is not supported by this record, and hence, is clearly erroneous. There is no testimony by any witness for the state concerning any agreement for adjournment by defendant or defendant's counsel. And both denied making any such agreement.

We recognize that the state argues that we should accept the "informal" practices of the Detroit Recorder's Court of that period as satisfying the strict terms of the I.A.D.

The State's brief says:

"In summary, the testimony at the evidentiary hearing indicated that, during the period in question, there existed in Recorder's Court a practice and custom wherein scheduled proceedings were frequently adjourned, in advance of the date set, by a relatively informal method. Such adjournments were not granted, however, without the parties being notified. In addition, any such continuances were ultimately authorized by the Court. Finally, it is clear that if objections were raised to the proposed continuance, the parties would bring the matter before the judge for resolution."

■ The trouble with this argument is that the informal practices described are in direct conflict with Art. IV(c) of the Interstate Agreement on Detainers. Article IV(c) requires that "good cause [be] shown in open court" with defendant or his counsel present. The District Judge correctly recognized that the term "open court" meant with a judge on the bench.

■ In fact, it does not appear from this record that anyone on the staff of the Wayne County Prosecutor (who filed the detainer) or on the staff of Recorder's Court had any acquaintance at all with the stringent terms of the Interstate Agreement on Detainers which the State of Michigan had formally adopted. A Deputy Clerk of Recorder's Court testified extensively at the remand hearing before the District Judge concerning the "informal" continuance procedure.

He testified that the continuance of October 2 had been entered in his handwriting, while the one of December 2 was in the handwriting of another clerk, and that in neither instance was there any notation (as required by court custom) of the presence of a judge on the bench at the time the continuance was entered. In fact, the Recorder's Court record and the evidence at the habeas hearing do not show any explanation of the continuances except routine docket management by court clerks. Careful examination of this record shows no better explanation of the critical violation of the I.A.D. than the testimony of the Deputy Clerk that he had never heard of the I.A.D. IV(c) 120 day limitation until a few days before his testimony in federal court in this case:

"Q Just a couple more questions, Mr. Krause. You were never notified by anybody about any 120-day rule or speedy trial problem in this case?

"A None that I recall at all. In fact, I don't remember it at all because I was quite surprised. I heard about such a rule the last day or so."

Whatever merits informality may have in some situations, it is obviously inconsistent with the highly structured procedural requirements of the I.A.D. And, as the District Judge recognized, the stringent enforcement sanction of Article V(c) ("dis-

missal of the indictment with prejudice") requires no showing of prejudice.

When 46 states, the District of Columbia, and the United States Government, acting through Congress and the President, entered into the I.A.D., each of the 48 participants yielded some small measure of its sovereignty. The Agreement was written with meticulous care. It even anticipated the possibility that its terms might have harsh effects if employed by state officials who were ignorant of its terms. The Agreement specifically provided:

"Each State party to this agreement shall designate an officer who, acting jointly with like officers of other party States, shall promulgate rules and regulations to carry out more effectively the terms and provisions of this agreement, and who shall provide, within and without the State, information necessary to the effective operation of this agreement."

Art. VII.

The Agreement also provided in Article IX, "This agreement shall be liberally construed so as to effectuate its purposes."

Over and above the conclusions expressed in this opinion, any doubts this court might entertain concerning whether or not Congress' approval of the Interstate Agreement on Detainers rendered that agreement federal law for purposes of federal habeas corpus proceedings have been removed by the Supreme Court's opinion in *United States v. Mauro,* 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978). Dealing specifically with the 120 day limitation, Justice White's opinion for the Court there said:

"We do not accept the Government's narrow reading of this provision; rather we view Art. IV(c) as requiring commencement of trial within 120 days whenever the receiving State initiates the disposition of charges underlying a detainer it has previously lodged against a state prisoner. Any other reading of this section would allow the Government to gain the advantages of lodging a detainer against a prisoner without assuming the responsibilities that the Agreement intended to arise from such an action.

"Finally, we agree with the Court of Appeals in No. 77–52 that respondent Ford's failure to invoke the Agreement in specific terms in his speedy trial motions before the District Court did not result in a waiver of his claim that the Government violated Art. IV(c). The record shows that from the time he was arrested Ford persistently requested that he be given a speedy trial. After his trial date had been continued for the third time, he sought the dismissal of his indictment on the ground that the delay in bringing him to trial while the detainer remained lodged against him was causing him to be denied certain privileges at the state prison. We deem these actions on Ford's part sufficient to put the Government and the District Court on notice of the substance of his claim.

"The United States does not challenge the conclusion of the Court of Appeals that, if Art. IV(c) was applicable, it was violated by the extensive delay in bringing Ford to trial. Accordingly, we conclude that the Court of Appeals correctly reversed the judgment of the District Court and ordered that the indictment against Ford be dismissed.

"The judgment of the Court of Appeals in No. 76–1596 is reversed, and the case is remanded for further proceedings consistent with this opinion. In No. 77–52, the judgment of the Court of Appeals is affirmed."

*United States v. Mauro, supra* at 436 U.S. at 363–364, 98 S.Ct. at 1849 (footnotes omitted).

For the reasons previously cited and on the authority of *United States v. Mauro, supra,* as just quoted above, the judgment of the District Court is vacated and the case is remanded for entry of the appropriate writ of habeas corpus.