David V. HAIGLER, Appellant,

v.

UNITED STATES, Appellee.

Nos. 85–735, 85–1141.

District of Columbia Court of Appeals.

Argued Jan. 6, 1987.

Decided Oct. 6, 1987.

G. Godwin Oyewole and Lawrence M. Baskir, for appellant.

David Schertler, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, and Blanche L. Bruce, Asst. U.S. Attys., were on brief, for appellee.

Before PRYOR, Chief Judge, and MACK and NEWMAN, Associate Judges.

MACK, Associate Judge:

Appellant argues that his convictions on two counts of armed robbery [1] must be reversed, and the indictment against him dismissed, because his right to an expedited trial under the Interstate Agreement on Detainers Act (IAD or Act), D.C.Code §§ 24–701 *et seq.* (1981), was violated. We agree with appellant's contention, and dismiss the indictment pursuant to Article V(c) of the IAD.[2]

## I

In an indictment filed August 9, 1983, appellant was charged with six armed robberies that occurred over a one week period near the end of March, 1983. Appellant's arraignment on those charges was set for August 19, 1983, but he failed to appear, and a bench warrant was issued for his arrest. Soon after, the government learned that appellant had been arrested in the state of Ohio and was being held in custody there. The government therefore filed a detainer with Ohio authorities on August 22, 1983, and on January 17, 1984, a Superior Court Judge issued a writ of habeas corpus *ad prosequendum* requiring appellant to be returned to the District of Columbia to face the pending armed robbery charges. Pursuant to that writ, appellant arrived in the District of Columbia on February 16, 1984 and appeared in Superior Court for arraignment on the following day. Under Article IV of the IAD, Mr. Haigler's trial should have commenced on or about June 15, 1984.

Although appellant's case was originally called for trial on May 17, 1984, he was not actually brought to trial until March 8, 1985, 386 days after he arrived in the Dis-

---

1. D.C.Code §§ 22–2901, –3202 (1981).

2. Appellant also contends that the trial court committed reversible error when it denied his motion to exclude identification evidence obtained from a police lineup at which appellant was not represented by counsel. Since we reverse on the basis of the government's violation of the IAD, we do not reach this issue.

trict.[3] The question before us is first, whether appellant preserved his right to a speedy trial under the IAD, and if so, whether the delays which resulted in appellant's trial being postponed beyond the 120–day deadline constituted continuances for "good cause" within the meaning of Article IV(c) of the Agreement.

## II

As the court in *Felix v. United States*, 508 A.2d 101 (D.C.1986) observed, previous decisions by this court have reviewed the history and general purposes of the IAD. *See id.* at 103 and cases cited therein. Essentially, the Act allows for the transfer of a person incarcerated in one state to another jurisdiction for the disposition of pending charges. *See generally United States v. Mauro*, 436 U.S. 340, 349–53, 98 S.Ct. 1834, 1841–44, 56 L.Ed.2d 329 (1978). One of the purposes of the IAD is to ensure the speedy disposition of charges outstanding against a prisoner in other jurisdictions:

> [C]harges outstanding against a prisoner, detainers based on untried indictments, informations, or complaints and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. Accordingly, it is ... the purpose of this agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints.

Article I, Interstate Agreement on Detainers.

The Act establishes two different mechanisms by which a prisoner against whom a detainer has been filed can be transferred to a second jurisdiction for expedited disposition of the outstanding charges. Under Article III(a), a prisoner triggers the application of the Agreement by requesting final disposition of outstanding charges connected with a detainer. Article III provides that after such a request is filed, the prisoner must be brought to trial within 180 days. The second mechanism is under Article IV(a), in which a prosecutor can have a prisoner who is serving a sentence in another jurisdiction (against whom a detainer has been filed) brought to the receiving state to stand trial. Under this article, the prisoner must be brought to trial within 120 days of the prisoner's arrival in the receiving state. Under Article IV, when the prosecutor initiates the extradition, there is no requirement that the prisoner make a request to be tried.

Both Article III and Article IV contain provisions which allow the stipulated time periods to be extended: "for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance." Finally, Article V(c) provides that if a prisoner is not brought to trial within the specified time periods—180 days for prisoner initiated proceedings and 120 days for prosecution initiated proceedings—the indictment, information, or complaint is to be dismissed with prejudice.

## III

■ The government does not contest the applicability of the 120–day provision of Article IV of the Act to appellant's case. Instead, it argues that appellant failed to preserve his right to assert an IAD claim on appeal by not raising the claim before or during trial. We find this argument unpersuasive.

"[A]bsent 'good cause shown,' a failure to present a claim under the Agreement at the trial level constitutes a waiver of those rights under Super.Ct.Cr.R. 12(d)." *Christian v. United States*, 394 A.2d 1, 37 (D.C. 1978) (per curiam), *cert. denied*, 442 U.S.

---

**3.** Prior to trial, the court granted appellant's motion to sever the six counts of the indictment. A jury returned a guilty verdict on one count of armed robbery on March 11, 1985, and appellant was sentenced to imprisonment for ten to thirty years. After a jury trial on the second count of armed robbery on July 30, 1985, appellant was found guilty and sentenced to twelve years to life imprisonment. The government thereafter dismissed the remaining armed robbery counts.

944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979). While it is true that appellant Haigler did not file a written motion to dismiss the charges against him until after trial, he was not required to do so before trial in order to preserve his rights under the Act. As long as his actions "put the Government and the [trial court] on notice of the substance of his claim" before trial, *United States v. Mauro, supra,* 436 U.S. at 365, 98 S.Ct. at 1849, appellant's claim under the Act is preserved.[4]

Appellant's attempt, pretrial, to explain the applicability of the IAD to his case was sufficient to put the court on notice. This is especially true considering that appellant had to raise his rights under the Agreement in the difficult context of trying to demonstrate that his counsel was incompetent for the very reason that counsel had failed to file a motion under the IAD to dismiss the indictment against appellant. Thus, on March 8, 1985, when pretrial motions were heard, the following colloquy took place:

THE COURT: The Court notes the presence of Mr. Haigler. Mr. Haigler, the Court is ready at this point to start with your trial. You had told me that you had some problems with the defense counsel. My question to you is do you have any problems other than the fact that this case has been delayed from time to time?

THE DEFENDANT: Yes, I do, Your Honor.

THE COURT: All right. Why don't you stand and tell me what your problems are with counsel.

THE DEFENDANT: My problem is this, your Honor. As the Court knows, I am not a lawyer. I was appointed a counsel because I needed him and now I might be wrong in assuming this—

THE COURT: Just tell me what you think the problem is.

THE DEFENDANT: I assume I'm not being given the correct information of things I need.

THE COURT: Like what?

THE DEFENDANT: For instance, there are certain motions to be filed; certain things can be filed that should have been filed.

THE COURT: Let me stop right now. You tell me "things," which is vague. Tell me specifically.

THE DEFENDANT: *Specifically, I am referring to an interstate agreement on detainers that was initiated by the District of Columbia against me when I was sentenced before the Honorable Richard Neihouse in Cincinnati, which I informed him I was wanted in Maryland and in the District of Columbia.*

Now, that's when it was initiated and he told me that my request automatically was a waiver of extradition.

THE COURT: Your request for what?

THE DEFENDANT: To be sent back to the District of Columbia.

THE COURT: Well, you are here in the District of Columbia now.

THE DEFENDANT: And he told me then, the District of Columbia, being a federal government, had priority and I said okay, I know that.

THE COURT: All right.

THE DEFENDANT: *Now, when I first came back here—and this was in front of Judge King—the district attorney tried to play like they didn't know anything about why I was here; how I was picked up; or they make mention to a writ. No one specifically brought up the fact that there was an interstate agreement of detainers.*

THE COURT: Well, are you claiming you have not been properly tried?

THE DEFENDANT: What I'm claiming now is prejudice to my whole trial and to the proceedings we're having right now.

THE COURT: What, specifically?

THE DEFENDANT: I'm prejudiced because of the delays in the trial, because

---

**4.** In *Mauro,* the Court held that the appellant's failure to invoke the Agreement in specific terms in speedy trial motions before the District Court did not result in a waiver of his claim that the government violated Art. IV(c), especially given that he sought the dismissal of his indictment on the ground that the delay in bringing him to trial was causing him to be denied certain privileges at the state prison.

of the disappearance and the death of one witness. At the time when the district attorney asked for a continuance, my lawyer at that point was ready to go to trial and my witness was still alive.

\* \* \* \* \* \*

THE COURT: Right now we're talking about you're dissatisfied with the actions of this attorney. You want the matter postponed? If I appoint another counsel, it will postpone your trial.

THE DEFENDANT: Now, that's another thing. I don't want to do or say anything now that's going to be accountable to me later on.

THE COURT: Well, we're ready to have a trial today and you don't want to go to trial today.

\* \* \* \* \* \*

THE COURT: ... [W]e are ready to go to trial and I don't think that—if you get new counsel now, it will delay your case even longer.

THE DEFENDANT: I am not asking for a new counsel. Let's go to trial.

Tr. of March 5, 1985, pp. 2–6 (emphasis added).

■ On this record, it is indisputable that appellant did raise the claim of his right to a speedy trial under the IAD, that he specifically pinpointed a claim of prejudice resulting from that delay,[5] and that he did not retract his claim, but agreed to go to trial under pressure to avoid further delay.[6]

The government's reliance on *Jenkins v. United States*, 483 A.2d 660 (D.C.1984), *cert. denied*, 469 U.S. 1224, 105 S.Ct. 1215, 84 L.Ed.2d 356 (1985), to argue that appellant's invocation of his rights under the IAD was inadequate is misplaced. In *Jen-*

*kins*, the only reference the defendant made to the IAD was in a pretrial memorandum supporting his motion to suppress a lineup identification, where he cited two IAD cases and mentioned his right to contest his transfer under the Agreement. The discussion of the IAD in *Jenkins*, which occurred during the hearing on the motion to suppress, was limited to the following statement made by defense counsel:

"Mr. Jenkins was brought into the District of Columbia on an interstate agreement, on de-detainer there. I believe he was not consulted about that. He was brought in on June—March the 6th— March the 1st."

The remainder of the hearing discussed the lineup; no further references were made to the IAD. *See Jenkins, supra*, 483 A.2d at 663 n. 6.

## IV

■ There is yet another respect in which this case can be distinguished from *Jenkins*. Due to an error on the part of the trial court, appellant was led to believe he had no rights under the IAD. Therefore even if we could agree (for the sake of argument) that appellant's efforts were inadequate to invoke his claim to a speedy trial thereunder, we could not penalize him for failing to more vigorously pursue rights he was specifically informed he did not have.

The record reflects that during a March 15, 1984 hearing, 27 days after Mr. Haigler had been brought into the District from Ohio on the prosecutor's initiative, the prosecution reminded the court that the IAD applied, and that the defendant had to be tried within 120 days. The court then asked when the defendant "made the re-

---

**5.** We do not mean to suggest that it was in any way necessary for appellant to demonstrate prejudice. A requirement of prejudice is found neither in the Agreement nor in its interpretations. *See Mauro, supra*, 436 U.S. at 364–65, 98 S.Ct. at 1849–50 (dismissal for violation of timely trial provision granted without examining whether defendant was prejudiced by delay).

**6.** The government's discussion of appellant's attempt to invoke his rights under the IAD and description of the above quoted colloquy does

not bear close scrutiny. In its brief, the government states: "The salient fact is that appellant ... never at any time claimed that his rights had been violated.... [O]n the day trial was ultimately set to begin, March 5, 1985, appellant in open court questioned his attorney's competence, asserting among other things that defense counsel had not filed motions challenging the validity of the indictment under the IAD. Later, at the same hearing, appellant retracted these claims." Government Brief, p. 8 & n. 10.

quest," stating: "He's got [to make] a request that you bring him here. And, when he makes that request, and you receive that request, it's got to be tried within a hundred and eighty days of that or a hundred and twenty days after he arrives in the jurisdiction." When the prosecutor stated that she had no information that he had made a request, but rather that he was brought in on "our writ," the trial court responded: *"Well, then, it's not an interstate agreement on detainers. He's got to request it."* Tr. of March 15, 1984, pp. 8–9 (emphasis added).[7]

It is true that under Article III of the IAD, it is the defendant's request that triggers application of the Agreement. But under Article IV, if the jurisdiction wishing to try the defendant requests extradition, there is no duty on the defendant to request to be tried. The defendant must be tried within 120 days unless good cause for continuance is demonstrated in open court. As the Supreme Court stated in *United States v. Mauro, supra,* 436 U.S. at 363–64, 98 S.Ct. at 1848–49 (footnotes omitted):

We do not accept the Government's narrow reading of this provision; rather we view Art. IV(c) as requiring commencement of trial within 120 days whenever the receiving State initiates the disposition of charges underlying a detainer it has previously lodged against a state prisoner. Any other reading of this section would allow the Government to gain the advantages of lodging a detainer against a prisoner without assuming the responsibilities that the Agreement intended to arise from such an action.

From the time of the March 15, 1984 hearing forward, it appears that the government, the defense, and the trial court all operated under the erroneous assumption that appellant's failure to make a request to be tried pursuant to Article III effectively waived his rights under the IAD. The court and the parties failed to consider that Article IV of the IAD requires no such request on the part of appel-

7. Specifically, the colloquy proceeded as follows:

MS. LILES: Your Honor, there is a problem with this case. This defendant was brought here under the I.E.D. [sic] Statute. And from—
THE COURT: When did the time start to run?
MS. LILES: It started running—it runs out June 14th.
THE COURT: *Runs out June 14th?*
MS. LILES: Yes. He arrived in this jurisdiction pursuant to our writ on February 16th of '84. And, my information reflects that the trial must commence by June 14th, 1984, within a hundred and twenty days of the defendant's arrival in this jurisdiction.
THE COURT: Or within a hundred and eighty days after he makes the request. When did you make the request?
MS. LILES: After we made the request?
THE COURT: No. He's got a request that you bring him here. And, when he makes that request, and you receive that request, it's got to be tried within a hundred and eighty days of that or a hundred and twenty days after he arrives in the jurisdiction.
MS. LILES: I don't have any information that he made a request. We brought him in on our writ.
THE COURT: Well, then, its not an interstate agreement on detainers. He's got to request it.
Do you know whether it was requested or not, Mr. Buckman?
MR. BUCKMAN: No, I do not, Your Honor.

THE COURT: Do you have anywhere in your paperwork what the specific Code cite is to the interstate agreement on detainers?
MS. LILES: 24 D.C.Code, Section 701.
THE COURT: 701?
MS. LILES: Yes.
THE COURT: All right. Mr. Haigler was serving a sentence in the other state? Is that right Mr.—
MR. BUCKMAN: I'm sorry, Your Honor. Did you ask me that question?
THE COURT: Yes.
MR. BUCKMAN: Yeah. I understand that he is serving a sentence in that other state.
MS. LILES: He has a burglary conviction. He was sentenced on December 20th of 1983 to four to fifteen years for burglary in Cincinnati, Ohio.
THE COURT: Nobody knows whether it was triggered by Mr. Haigler or not. Is that right?
MS. LILES: Everything that I have indicates that, no. We filed a detainer and he was— and then we filed a writ after he was sentenced. So, I have nothing in the file that shows a letter was signed by him.
THE COURT: Just a quick reading of the agreement and also my understanding of it is that those times apply only if it's been triggered by the defendant, formal request that the matter be dealt with.
Tr. of March 15, 1984, pp. 8–10.

lant, but instead is triggered by the prosecutor's writ. Under these circumstances, even if appellant's invocation of his rights under the IAD had been insufficient to put the trial court on notice, we would find his rights under the Agreement preserved. In the face of the decision by the trial judge that the IAD was inapplicable, without any argument to the contrary made by either the government or defense counsel, we would conclude that appellant had "good cause" for not invoking his rights under the Act at the trial court level pursuant to Super.Ct.Crim.R. 12(d).

## V

██ It is also contended that appellant's "own actions when the case was initially called for trial on May 17, 1984, amounted to a waiver of his rights under the IAD." The government thus repeats the trial court's mistake of assuming that waiver could be inferred from appellant's filing of various motions:

> When this case was initially called for trial on May 17, 1984—within the 120 day period—rather than announcing ready the defendant asked for additional time to file suppression and severance motions. The Court promptly drew counsel's attention to the application of the IAD, but counsel persisted in his request for extra time and expressly stated that he did not then wish to go forward with trial.

> The Court and the prosecution both were ready and able to try defendant within the requisite time limitations established by the Agreement and the case was not heard on March [May] 17th at defendant's express election. Given the fact that the Court had alerted defendant's counsel to the IAD, his decision not to go forward at the very least entitled the Court to infer from the circumstances that defendant was abandoning his claims under the IAD for reasons he deemed more important—a perceived need for additional time to prepare sever-

ance and suppression motions. Defendant may not now be heard to complain that he was not tried within time limits precluded by his own request.

Memorandum Opinion and Order of August 5, 1985, at 5–6.

The idea that appellant's right to be tried speedily under the IAD turned on his agreement to forego filing pretrial motions is wholly without merit. It offends basic principles of criminal justice to suggest that a defendant must forego one constitutional or statutory right in order to exercise another. Appellant could not be understood to waive his rights under the IAD simply because he exercised his right to make pretrial motions.[8] Moreover, the Act has been construed to avoid this dilemma. "[I]n computing whether or not the requirements of Article IV(c) have been satisfied, it is appropriate to exclude all those periods of delay occasioned by the defendant," *United States v. Scheer,* 729 F.2d 164, 168 (2d Cir.1984). The time consumed in consideration of appellant's motions (May 17, 1984–June 13, 1984) is simply not counted in the 120–day period allotted the government to bring appellant to trial under Article IV. Appellant's exercise of his right to make pretrial motions does not bar him from asserting a claim under the IAD.

## VI

Since we find appellant did not waive his rights under the IAD, the only question remaining is whether the delay in bringing appellant to trial was improper.

If there had been no necessary or reasonable continuances, appellant's trial should have begun by June 15, 1984, or within 120 days of appellant being brought into the District. Since the trial did not commence until March 8, 1985, the specific question for this court is whether the full 266 days over the 120–day period can be attributed to necessary and reasonable continuances that were granted for good cause, shown in open court, the petitioner or his counsel

---

**8.** We note that appellant's motions were in no way frivolous. The motion to sever the six counts of the indictment was granted, and the trial court ruling denying the motion to sup-

press the identification evidence from the lineup conducted outside the presence of counsel is certainly not an uncontroversial decision (*see supra* note 2).

being present pursuant to D.C.Code § 24–701, Article IV(c).

It is difficult to ascertain from the record whether certain of the continuances granted here were granted for good cause as defined by Article IV(c). A substantial amount of delay in this case was due to such causes as the illness of defense counsel, illness of a government witness, and the failure to secure appellant's presence from jail. The record is unclear, however, concerning the procedures the court employed it granting many of these continuances. We cannot determine from the record, for example, whether certain continuances were granted following proceedings in open court, and if so, whether appellant or his counsel attended such proceedings.

■ In some cases where the record is unclear concerning the circumstances under which a continuance was granted, courts have remanded for the trial court to determine whether the petitioner nonetheless agreed to the continuance. *See Johnson v. Stagner*, 781 F.2d 758 (9th Cir. 1986). Here, however, a remand would not suffice in view of the record. Thus, the trial court specifically informed appellant on May 17, 1984 that it found the Act inapplicable to his case due to his failure to make a request. Under these circumstances, it is impossible for us to conclude that appellant could have "agreed" or "acquiesced" to any continuances granted after that date which would have excused compliance with the strictures of Article IV(c).

Appellant was brought to the District and arraigned on February 17, 1984. With both appellant and his counsel present, at the request of the government the court continued the case until March 22, 1984 for a status hearing. After a status hearing on March 15 at which appellant and his counsel both were present, the court continued the case until May 17, 1984. From May 17 to June 13, the court considered appellant's pretrial motions. A continuance from June 13 to June 15 was granted because the government attorney was involved in another trial. On June 15, in the presence of appellant and his attorney, the court granted a continuance until June 29 due to court congestion for the motions hearing, and set a September 20, 1984 trial date. On July 19, 1984, the government failed to have appellant brought up from jail, and the case was continued until September 20, 1984 for both trial and consideration of pretrial motions. On September 20, both the court and government counsel were in trial and unavailable. With appellant and his counsel (who was ill) present in court, it was determined that the court would be unable to reach the case until January 3, 1985. On December 26, 1984, the case was reassigned to another judge. On January 3, 1985, the date trial was finally to have taken place, a government witness was ill. At the government's request, and in the presence of appellant and his counsel, the court granted a continuance until March 5, 1985. The court heard appellant's pretrial motions on March 5 and 6. On March 8, 1985, appellant was at last brought to trial.

■ While there are certainly other delays potentially chargeable to the government (*e.g.*, the period from February 17 to May 17), it is necessary to consider only two periods of delay to conclude that more than 120 days' delay occurred in the absence of "good cause," as that term is defined pursuant to D.C.Code § 24–701, Article IV(c). The delay from September 20, 1984 to January 3, 1985 for "court congestion" is one such period. The second is the delay granted at the request of the government from January 3, 1985 to March 5, 1985. Together, these delays total 166 days, thus exceeding the 120–day time limit of Article IV.

The "good cause" provision in the IAD has been strictly construed. As this court stated in *Felix v. United States, supra*, 508 A.2d at 109:

In construing the Act's "good cause provision," courts have insisted that any continuance be granted "in open court" in the presence of either the defendant or his counsel as required by the Act. *See, e.g., Baylor v. United States, supra*, 500 A.2d [1012] at 1015 [D.C. (1985)]; *Unit-*

*ed States v. Ford, supra,* 550 F.2d [732] at 743 [2nd Cir. (1977)].... This strict construction approach, *see United States ex rel. Holleman v. Duckworth,* 592 F.Supp. 1423, 1426 (N.D.Ill.1984), *reversed on other grounds,* 770 F.2d 690 (7th Cir.1985), *cert. denied,* [474] U.S. [1069], 106 S.Ct. 828, 88 L.Ed.2d 800 (1986), arises from the recognition that, because the government, through its agents, controls the procedural aspects of the Act, and because the IAD's underlying purpose is to promote the best interests of the prisoner by preventing abuses in the detainer system, the Act's provisions must be liberally construed so as to effectuate its purposes. *See McBride v. United States, supra,* 393 A.2d [123] at 128 [D.C. (1978)], *Pittman v. State,* 301 A.2d 509, 513 (Del.1973); *see also Cuyler v. Adams,* 449 U.S. 433, 448–50, 101 S.Ct. 703 [711–13], 66 L.Ed.2d 641 (1981).

In order for continuances granted due to court congestion to constitute continuances granted for "good cause," there must be documented or recorded evidence that the trial court took affirmative steps to try the defendant within the applicable time limits. "[U]nder the generally accepted view, before the trial court may delay a trial beyond the time limits set out in Articles III or IV because of calendaring difficulties, there must be some showing that the trial judge attempted to take steps to have the trial commence in a timely fashion."[9] *Id.* at 108. The court in *Johnson v. Stagner, supra,* 781 F.2d at 758, for example, held that in the case of continuances resulting from scheduling problems, such problems do not constitute "good cause" for exceeding the IAD's time limits, "unless the trial judge actively attempted to reassign the prisoner's case to other judges in order to speed along its progress." *Id.* at 763. The court noted that nothing in the record reflected any effort by the trial court to transfer the appellant's case. The court in *Brown v. Wolff, supra,* 706 F.2d at 906, similarly found that "where the trial judge has not attempted to transfer the case to another judge or to adjust or increase the criminal calendar, the weight of authority supports the view that the court is not sufficiently congested to constitute good cause for extension." *See also United States v. Ford, supra,* note 9, 550 F.2d at 743 (congestion held not good cause where no attempt was made to transfer case to another judge or to increase criminal trial calendar); *State ex rel. Hammett v. McKenzie, supra,* note 9, 596 S.W.2d at 58 ("crowded docket" held not good cause because civil cases should be continued so that IAD cases are timely).

In the instant case, the case was reassigned to another judge; however, the transfer occurred far too late, and apparently without awareness of the fact that appellant's trial was long overdue according to the provisions of Article IV of the IAD. The reassignment was made on December 26, 1984, after 97 days of delay for court congestion had already accrued. Trial was in no way speeded up by the transfer, and in fact did not take place until March 8, 1985. Under these circumstances, the reassignment did not support a determination of delay for "good cause." *See United States v. Ford, supra.*[10] Thus

---

9. "See, e.g., *Brown v. Wolff,* 706 F.2d 902, 906 n. 8 (9th Cir.1983); *United States v. Ford,* 550 F.2d 732, 743 (2d Cir.1977), *aff'd sub nom. United States v. Mauro,* 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978); *People v. Bell,* 669 P.2d 1381, 1386 n. 3 (Colo.1983); *People v. Forrest,* 72 Mich.App. 266, 273, 249 N.W.2d 384, 388 (1976); *State ex rel. Hammett v. McKenzie,* 596 S.W.2d 53, 58–59 (Mo.App.1980) (en banc); *State v. Aaron,* 102 N.M. 187, 191, 692 P.2d 1336, 1340, ([Ct.App.] 1984); *People v. Miller,* 34 N.Y.2d 336, 337–338, 357 N.Y.S.2d 457, 458, 313 N.E.2d 761, 762 (1974); *compare People v. Watson,* 650 P.2d 1340, 1343 (Colo.App.1982) (continuance because trial judge was ill held to be for good cause); *Commonwealth v. Carrillo,* 5 Mass.

App.Ct. 812, 813, 361 N.E.2d 415, 416 (1977) (continuance because of scheduling difficulties due to imminent end of annual court term held to be for good cause). *But see United States v. Methven,* 547 F.2d 896 (5th Cir.1977)." *Id.* at 108.

10. In *Ford,* the original trial judge resigned and the case was transferred to another judge. The trial date was postponed for three months without explanation. The court found that while part of this delay may have been occasioned by the transfer of the case, the larger part could only be accounted for on the assumption that the second judge's calendar was already full.

there is nothing in the record before us to explain the lengthy delay, nor is there any indication that the trial court took any special steps to speed up appellant's trial. The trial court simply postponed appellant's trial for 73 days because the court calendar was full, neglecting to undertake any steps to protect appellant's speedy trial rights under the IAD.

There are strong policy reasons for not allowing "court congestion," with nothing more, to qualify as delay for good cause. As this court stated in *Felix:*

> [W]hile a crowded trial court calendar may in some circumstances constitute good cause for granting reasonable and necessary continuances under the IAD, it does not amount to *per se* good cause. Otherwise, in these times of chronic court congestion, the "good cause" exception could eviscerate the Act's speedy trial provisions. We recognize that because of serious scheduling conflicts it may not always be possible to accommodate the time limits imposed by the Act. Nevertheless, efforts must be made to adjust the court's calendar so as to commence trial proceedings in a timely fashion before continuances are granted due to court congestion.

*Id.* at 109.

Moreover, for the same reason that we have stated before (in view of the misleading information given appellant as to the application of the IAD, *supra* at 1242), there is no reason for this court to remand for a determination as to whether the petitioner nonetheless agreed to the continuance. *See Johnson v. Stagner, supra,* 781 F.2d at 764 (where record unclear concerning both the trial court's reasons for and the procedures it employed in granting the continuance, remanded for determination whether continuance explicitly stipulated to); and *Brown v. Wolff, supra,* 706 F.2d at 906–07 (state's failure to make an effort to transfer the case to another judge or to

adjust or increase the criminal calendar was a violation of the IAD; however, fact that appellant explicitly agreed to continuance resulted in waiver of IAD rights.). Even if the government could show that appellant and his counsel agreed to a continuance because of court congestion, we could not conclude that a valid waiver of rights under the IAD occurred. We may conclude as a matter of law, that the delay for court congestion here did not constitute delay for "good cause" as we have defined that term under Article IV(c).

■ The second period of delay which we conclude is chargeable to the government occurred on January 3, 1985. On that date, a government witness (a police officer) was ill. The government requested and was granted a continuance until March 5, 1985. We find that the amount of time the trial was delayed due to the illness of one government witness (61 days) was unreasonable. From the record, it does appear that appellant and his counsel were present in court at the time the continuance was granted. As we have explained repeatedly, however, we cannot conclude that appellant's apparent "acquiescence" to the continuance was in any sense a true waiver, given that he had been told he had no rights under the Interstate Agreement on Detainers.

Moreover, even without the special circumstances presented by this case, this court could not simply conclude in the absence of evidence otherwise that it is reasonably probable that the defendant or his counsel agreed to a given continuance. When the record does not indicate that a disputed continuance was ever granted on good cause shown in open court, when it shows no motion for continuance filed by petitioner or his counsel, and when the record shows no notice to them of such a motion by the prosecution or the court itself, we will not presume the delay excluded from the IAD's specified limits.[11]

The court held that "under such circumstances it is the responsibility of the trial judge to reassign cases to assure defendants their right to a speedy trial," and found that the delay was neither "necessary," "reasonable," nor "for good

cause" within the meaning of Article IV(c). *Ford, supra,* 550 F.2d at 743.

**11.** *See Stroble v. Anderson,* 587 F.2d 830, 839 (6th Cir.1978), *cert. denied,* 440 U.S. 940, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979) ("[T]he informal

The government has an affirmative duty to make a record on the question of whether continuances have been granted for good cause in keeping with Article IV(c). Since appellant made a prima facie showing that the IAD's 120–day period was exceeded in his case, the government is required to demonstrate either that the various continuances granted here were granted in open court for good cause, or that appellant consented to the continuance. *See Johnson v. Stagner, supra,* 781 F.2d at 764 ("At the trial court level, the burden was on the State ... to "show good cause in open court in the presence of the prisoner or his counsel for the granting of [the] continuance") (citation omitted); *see also Brown v. Wolff, supra,* 706 F.2d at 906–07 (placing burden on state to demonstrate good cause for exceeding 180–day limit rather than requiring petitioner to demonstrate lack of good cause); *United States v. Ford, supra,* 550 F.2d at 743 (same placement of burden in federal prosecution).

The government's affirmative responsibility under the Act is best explained by the court in *Stroble v. Anderson, supra,* 587 F.2d at 840:

> When 46 states, the District of Columbia, and the United States Government, acting through Congress and the President, entered into the I.A.D., each of the 48 participants yielded some small measure of its sovereignty. The Agreement was written with meticulous care. It even anticipated the possibility that its terms might have harsh effects if employed by state officials who were ignorant of its terms. The Agreement specifically provided:
>
> > "Each State party to this agreement shall designate an officer who, acting jointly with like officers of other party States, shall promulgate rules and regulations to carry out more effectively

the terms and provisions of this agreement, and who shall provide, within and without the State, information necessary to the effective operation of this agreement." [Citing Article VII, IAD.]

The primary purpose of the IAD is to "encourage the *expeditious* and orderly disposition of [outstanding criminal] charges." IAD, Article 1 (emphasis added). With no other reason than the illness of one government witness supporting the delay here, and given the impossibility of appellant's agreement to the continuance, we find the delay from January 3, 1984 to March 5, 1984 chargeable to the government. The 105–day delay occurring because of court congestion and the 61–day delay granted because of the illness of a government witness together amount to a delay of 166 days, exceeding the 120–day limit. Under Article V, the indictment must be dismissed with prejudice.

*Reversed.*

---

practices described are in direct conflict with Art. IV(c) of the Interstate Agreement on Detainers.... [I]t does not appear from this record that anyone on the staff of the Wayne County Prosecutor (who filed the detainer) or on the staff of Recorder's Court had any acquaintance at all with the stringent terms of the Interstate Agreement on Detainers which the State of Michigan had formally adopted.... [T]he Recorder's Court record and the evidence at the habeas hearing do not show any explanation of the continuances except routine docket management by court clerks.... Whatever merits informality may have in some situations, it is obviously inconsistent with the highly structured procedural requirements of the I.A.D.").