Danny FELIX a/k/a Danny
Jackson, Appellant,

v.

UNITED STATES, Appellee.

No. 83–1401.

District of Columbia Court of Appeals.
Argued Nov. 12, 1985.
Decided April 28, 1986.

Stephen R. Lohman, Washington, D.C. appointed by the court, for appellant.

Lizabeth A. McKibben, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on brief, for appellee.

Before PRYOR, Chief Judge, STEADMAN, Associate Judge, and PAIR, Senior Judge.

PRYOR, Chief Judge:

Appellant argues in this appeal that his convictions on four counts of robbery [1] must be reversed, and the indictment against him dismissed, because his right to an expedited trial under the Interstate Agreement on Detainers Act (IAD or Act), D.C.Code §§ 24–701 et seq. (1981), was violated. We find that appellant's rights under the IAD were not violated and, accordingly, affirm his convictions.

### I

On July 15, 1982, a complaint was filed in the Superior Court of the District of Columbia charging appellant with one count of robbery. Pursuant to that complaint, the Office of the United States Attorney for the District of Columbia, on September 23, 1982, lodged a detainer against appellant in Queens, New York, where appellant was then incarcerated pending trial on New York State robbery charges.[2] In late February 1983, appellant was convicted and sentenced in New York on four counts of robbery. Thereafter, while awaiting transfer to a permanent correctional facility, appellant was temporarily imprisoned, first in the Downstate Correctional Facility, located in Fishkill, New York, and then, following a transfer on March 22, 1983, in the Ossining Correctional Facility Transit Unit in Ossining, New York.

On April 20, 1983, while still incarcerated at Ossining, N.Y., appellant mailed to the United States Attorney's Office in the District of Columbia, a form entitled "Inmate's Notice and Request," in which appellant requested pursuant to the IAD a final disposition of the robbery charge listed in the September 23 detainer. The United States Attorney's Office received this letter on April 26, 1983. Acting immediately on appellant's request, the government petitioned for a writ of habeas corpus *ad prosequendum*, as the means to have appellant brought from New York to the District of Columbia for the purpose of standing trial. The Superior Court granted the writ on April 27, 1983.

On May 15, 1983, pursuant to the writ of habeas corpus *ad prosequendum*, appellant was transferred from the Ossining Correctional Facility to the District of Columbia Jail. After his arrival in the District of Columbia, appellant was presented before a magistrate on May 23, 1983, and an attorney was appointed to represent him. At a preliminary hearing on June 2, 1983, appellant's case was held for grand jury action and a commitment order was entered. The record indicates that no further action was taken concerning appellant's case until July 25, 1983. On July 25, the single robbery count alleged in the July 1982 complaint was dismissed and in its place an indictment was filed charging appellant with five counts of robbery, one count of second-degree burglary, and one count of grand larceny.[3]

Approximately one week later, on August 3, 1982, appellant was arraigned in Superior Court and entered pleas of not guilty on all counts. The case was continued for a status hearing to be held September 12, 1982.

---

1. D.C.Code § 22–2901 (1981).

2. These charges were unrelated to the robbery charges filed against appellant in the District of Columbia.

3. The charges all arose out of a series of purse snatchings which occurred in a neighborhood of Northwest Washington during June and July of 1982.

Sometime after the August 3 arraignment, the United States Attorney's Office, apparently recognizing the potential time constraints raised by appellant's April 20 "final disposition" request, arranged to have the September 12 status hearing moved up to September 1. On September 1, however, the hearing had to be continued until September 2 because arrangements had not been made to have appellant brought up from jail.

At the next day's status hearing, appellant specifically reasserted his right to a speedy trial under the IAD, and asked the court to observe that right. A discussion among the trial judge and both counsel concerning the IAD's time restraints as applied to the instant case ensued. Both the prosecutor and defense counsel represented to the trial court that under the Act appellant had to be tried within 120 days of his arrival in the District of Columbia, and that the last day on which appellant's trial could commence was Saturday, September 17, 1983.[4] The trial court notified counsel that he would be engaged in another trial until September 17. Because September 17 was a Saturday, defense counsel requested that the trial commence on Friday, September 16. The trial judge, however, agreed to the prosecutor's request that the trial begin on Monday, September 19. Prior to setting the September 19 trial date, the trial judge asked the prosecutor whether under the Act "court congestion" constituted a "good cause" basis for not trying appellant within the time limits stipulated in the Act. The prosecutor replied that court congestion did provide reasonable and necessary grounds for the granting of a continuance.

On the morning of September 19, appellant made an oral motion to dismiss the indictment against him, claiming that he had not been brought to trial within 120 days of his arrival in the District of Columbia, in violation of Article IV of the IAD.

The court denied appellant's motion on the grounds that any delay in the commencement of trial was a "good cause" delay due to the court's crowded calendar. Trial in appellant's case did not commence following resolution of these preliminary matters because the trial judge was still in the midst of another trial. Instead, the trial judge continued appellant's case for trial until September 23.

On the afternoon of Friday, September 23, 129 days after appellant's arrival in the District of Columbia, the jury in appellant's case was sworn and voir dire commenced. Following a five-day trial, the jury returned guilty verdicts on the four robbery counts. Thereafter, on November 10, 1983, the trial court sentenced appellant to terms of imprisonment of two to six years on each of the robbery counts, to run consecutive to each other and to appellant's still unserved New York sentence. This appeal followed.

## II

### A.

Previous decisions by this court have reviewed the history and general purposes of the IAD. *See, e.g., United States v. Bailey,* 495 A.2d 756, 758 (D.C.1985); *Dobson v. United States,* 449 A.2d 1082, 1085 (D.C. 1982), *cert. denied,* 464 U.S. 831, 104 S.Ct. 109, 78 L.Ed.2d 111 (1983); *McBride v. United States,* 393 A.2d 123, 127 (D.C. 1978), *cert. denied,* 440 U.S. 927, 99 S.Ct. 1260, 59 L.Ed.2d 482 (1979). In short, the IAD establishes procedures for the transfer of a person who "has entered upon a term of imprisonment" from one jurisdiction to another jurisdiction for the disposition of a pending untried indictment, information, or complaint. *See generally United States v. Mauro,* 436 U.S. 340, 349–53, 98 S.Ct. 1834, 1841–43, 56 L.Ed.2d 329 (1978). the underlying purpose of the Act is set out in Article I which provides in part:

---

4. In fact, the parties erred in calculating the last day of the 120-day period. The correct date was Wednesday, September 14, 1983.

charges outstanding against a prisoner, detainers based on untried indictments, informations, or complaints and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. Accordingly, it is ... the purpose of this agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints.

The Act establishes two alternate and distinct mechanisms by which a prisoner against whom a detainer has been filed can be transferred to a second jurisdiction for expedited disposition of the outstanding charges. *See generally United States v. Scheer*, 729 F.2d 164, 167 (2d Cir.1984); *State v. Mason*, 90 N.J.Super. 464, 471, 218 A.2d 158, 162 (1966); L. ABRAMSON, CRIMINAL DETAINERS 37, 51 (1979).

Article III (a) of the IAD sets out terms by which a prisoner may request final disposition of outstanding charges connected with a detainer. It provides that after such a request is filed, the prisoner must be brought to trial within 180 days:

> Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party State, and whenever during the continuance of the term of imprisonment there is pending in any other party State any untried indictment, information, or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred and eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information, or complaint: .... The request of the prisoner shall be accompanied by a certificate of the appropriate official having custody of

the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decision of the State parole agency relating to the prisoner.

The Act also provides a mechanism that can be initiated by a prosecutor seeking to have a prisoner who is serving a sentence in another jurisdiction, and against whom a detainer has been filed, made available for trial. In such a case, the prisoner must be brought to trial within 120 days of the prisoner's arrival in the receiving state. Thus, under Article IV (a):

> The appropriate officer of the jurisdiction in which an untried indictment, information, or complaint is pending shall be entitled to have a prisoner against whom he has lodged a detainer and who is serving a term of imprisonment in any party State made available in accordance with article V (a) hereof upon presentation of a written request for temporary custody or availability to the appropriate authorities of the State in which the prisoner is incarcerated: Provided, that the court having jurisdiction of such indictment, information, or complaint shall have duly approved, recorded, and transmitted the request: And provided further, that there shall be a period of thirty days after receipt by the appropriate authorities before the request be honored, within which period the Governor of the sending State may disapprove the request for temporary custody or availability, either upon his own motion or upon motion of the prisoner.

Article IV (c) states:

> trial shall be commenced within one hundred and twenty days of the arrival of the prisoner in the receiving state....

Both Article III and Article IV contain provisions which allow the stipulated time periods to be extended under certain circumstances. According to the Act,

for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.

Finally, Article V (c) provides that if a prisoner is not brought to trial within the specified time periods—180 days for prisoner initiated proceedings and 120 days for prosecution initiated proceedings—the indictment, information, or complaint is to be dismissed with prejudice.

### B.

■ As a threshold matter we are confronted by the government's assertion that the IAD does not apply in the instant case. Relying primarily on our decision in *Christian v. United States*, 394 A.2d 1 (D.C. 1978), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979), which held that the Act does not protect pretrial detainees, the government argues that the Act cannot be invoked by a prisoner who, like appellant, has been convicted and sentenced, but for administrative reasons is incarcerated by the sending state in a temporary "Transit Unit," and is awaiting transfer to a permanent correctional institution.[5] We find the government's interpretation of the Act unduly restrictive.

In *Christian v. United States, supra,* we held that the defendants, who had been temporarily incarcerated in Philadelphia pending disposition of outstanding charges at the time of their transfer from Philadelphia to the District of Columbia, were not entitled to invoke the protections of the IAD. *Id.*, 394 A.2d at 40–41. Reviewing the language and legislative history of the Act, the court emphasized that the IAD was intended "to cure the disadvantages of the detainer system inuring to sentenced

prisoners who had entered the life of the institution to which they had been committed." *Id.* at 40. Because pretrial detainees are not involved in institutional treatment or rehabilitative programs, "the potential for abuse of the detainer system is not present," and, accordingly, the Act did not apply. *Id.*

The rationale underlying *Christian* and other cases holding that a pretrial detainee is not "serving a term of imprisonment" within the meaning of the IAD, is not applicable to the instant case. Here, at the time appellant requested a final disposition of the District of Columbia charges pending against him, and was transferred pursuant to that request, he was serving a sentence imposed following a New York conviction. The fact that administrative considerations required that appellant be placed in a correctional facility "Transit Unit" did not diminish his interest in obtaining rehabilitation and in avoiding the adverse consequences on the conditions of his confinement caused by the outstanding detainer. While a pretrial detainee generally has no immediate interest in either current or potential rehabilitation in his status as pretrial detainee, an incarcerated person who is serving a final sentence does have an immediate interest in, at the very least, potential rehabilitation.

■ Moreover, the government misapplies the Act's stated goal of preventing interference with a prisoner's rehabilitation. Though the Act speaks generally about preventing uncertainties which can undermine an inmate's overall rehabilitation, active enrollment in a specific rehabilitation program is not a stated prerequisite to invocation of the Act's protections. Indeed, rehabilitation in this context refers to

---

5. The government directs the court's attention to a letter, dated October 4, 1983, which was written by Joan D. House, Inmate Records Coordinator for the Ossining Correctional Facility and sent to the Assistant United States Attorney in charge of the instant case. In the letter, Ms. House advised that appellant was incarcerated in the Ossining Correctional Facility Transit Unit which "is not a permanent facility but is

a 'holding bin' for inmates to be transferred to their permanent facility." Appellee argues that since the IAD's primary purpose is to prevent interruptions in a prisoner's rehabilitation, and appellant was not actively involved in rehabilitation at the time of his transfer, appellant was not eligible for the Act's protections. For the reasons stated herein, we disagree with appellee's interpretation of the Act's scope.

the general concept of rehabilitation and not a particular rehabilitation scheme. As the Supreme Court has observed, detainers can have other detrimental effects on a prisoner's treatment aside from the negative impact they may have on a prisoner's ability to participate in a designated rehabilitation program. *Carchman v. Nash,* ——— U.S. ———, 105 S.Ct. 3401, 3408 n. 8, 87 L.Ed.2d 516 (1985). For example, because of outstanding detainers an inmate may be classified as a maximum or close custody risk, ineligible for certain work assignments, denied preferred living accommodations, deemed ineligible for work release programs, or denied the possibility of parole. *Id.* (citing *Cooper v. Lockhart,* 489 F.2d 308, 314 n. 10 (8th Cir.1973)); *see also* L. ABRAMSON, *supra,* at 64–65, 81. Significantly, evidence in the record suggests that one reason why appellant had not been transferred from the temporary Transit Unit to a permanent correctional facility was specifically because of the outstanding District of Columbia detainer.

▉ In sum, once a person has been convicted, sentenced, and has begun serving that sentence in the sending jurisdiction, that person's status is distinguishable for purposes of invoking the Act's protections from that of a pretrial detainee. *See Dobson v. United States, supra,* 449 A.2d at 1085 (IAD becomes "pertinent" once an individual is "tried, convicted and sentenced"); *Bean v. United States,* 409 A.2d 1064, 1065 (D.C.1979) (same). This is true even where the prisoner is awaiting transfer from one correctional facility to another. Different jurisdictions maintain various types of correctional institutions and different administrative procedures for both incarcerating a prisoner and instituting that prisoner's rehabilitation program. Uncertainty would be created if every time an IAD claim was raised this court was required to examine an individual prisoner's rehabilitative status within a particular state correctional system.

Thus, we find that appellant was "serving a term of imprisonment" within the meaning of the Act. Our holding is consistent with the widely accepted view that a prisoner's operative rights under the Act arise once the prisoner begins serving a term of imprisonment. *See, e.g., Baylor v. United States,* 500 A.2d 1012, 1013 n.2 (D.C.1985); *United States v. Roy,* 771 F.2d 54, 57–58 (2d Cir.1985); *People v. McLemore,* 95 Mich.App. 536, 547, 291 N.W.2d 109, 115 (1980), *judgment reversed,* 411 Mich. 691, 311 N.W.2d 720 (1981); *State v. Wilson,* 41 Wash.App. 397, 400, 704 P.2d 1217, 1220 (1985); *compare Romans v. District Court,* 633 P.2d 477, 479–80 (1981) (en banc) (defendant committed to custody for purposes of 90-day observation and evaluation had not entered "term of imprisonment," and thus, was not eligible for IAD protection until such time final sentence was announced).

### III

Having determined that the IAD governs here, we turn to the issue of whether the Act has been violated. In that regard, the central question presented is which of the Act's two speedy trial provisions was triggered in the instant case: the 120-day provision contained in Article IV as appellant contends, or the 180-day speedy trial provision of Article III as the government maintains.

As outlined above, the sequence of events leading up to appellant's transfer under the IAD were as follows: (1) the prosecutor's office in the District of Columbia lodged a detainer against appellant based on an outstanding indictment for robbery; (2) appellant then filed a request for a final disposition of the pending charges which was forwarded to the United States Attorney's Office in the District of Columbia; and (3) the prosecutor's office in the District of Columbia obtained custody of appellant by means of a writ of habeas corpus *ad prosequendum.* Under the plain language and structure of the Act, since appellant was the one who filed a request for a final disposition of the charges underlying the detainer, it would

seem that his case is controlled by Article III. Appellant contends, however, that Article IV is the appropriate section here.

Appellant does not dispute that in April of 1983, he filed a formal request with the prosecutor's office for final disposition of the outstanding robbery charges. He argues, however, that the 120-day speedy trial provision of Article IV is applicable because it was the government which ultimately procured his presence in the District of Columbia by means of a writ of habeas corpus *ad prosequendum.* In support of his claim, appellant relies on *United States v. Mauro, supra.* In that case, the Supreme Court held that where a receiving state lodges a detainer against a prisoner and subsequently uses a writ of habeas corpus *ad prosequendum* to obtain custody of that prisoner, the writ constitutes a "written request for temporary custody" within the meaning of the Act, triggering the protections contained in Article IV. *Id.,* 436 U.S. at 361–62, 98 S.Ct. at 1847–48. Appellant contends that since the prosecutor here both lodged the detainer and obtained custody by means of a writ of habeas corpus *ad prosequendum,* the government was obliged under *Mauro* to comply with the provisions contained in Article IV. This argument is not persuasive.

The facts in *Mauro* show that, unlike appellant, the prisoner in that case never filed an "intervening" request for a final disposition of the charges underlying the detainer. Absent a prisoner request, the only section of the Act which could have applied, once the Court found the Act controlling, was Article IV. More importantly, the Court's main consideration in *Mauro* did not pertain to which Article of the Act was operative, but rather whether, under the circumstances presented, the Act had been triggered at all. Specifically, the Court expressed concern that the government was attempting to circumvent its obligations under the Act by following up the

filing of a detainer with a writ of habeas corpus *ad prosequendum* in place of a statement expressly entitled "written request for temporary custody." *Id.* at 362, 98 S.Ct. at 1848. According to the Court, even though the Act speaks of transfers made by a written request for temporary custody, "[t]he fact that the prisoner is brought before the district court by means of a writ of habeas corpus *ad prosequendum* in no way reduces the need for [a] prompt disposition of the charges underlying the detainer." *Id.*

Here, the government clearly did not attempt to circumvent the Act's provisions.[6] Indeed, the government maintains that as a matter of standard procedure they petition for and utilize writs of habeas corpus *ad prosequendum* in order to help accommodate a prisoner who has filed a written request under the IAD for final disposition of charges. Nor does the government attempt to deny appellant his right to a speedy trial. Rather, they argue that under the Act they were required to effectuate a speedy trial within 180 days and not 120 days.

■ In effect, appellant's argument contemplates that the critical conduct which determines which speedy trial provision applies, involves how the prisoner is transferred to the receiving jurisdiction. The generally accepted view is, however, that notwithstanding the mechanism used to obtain a prisoner's custody in the receiving state, where a prisoner files the proper written notice or certificate requesting final disposition of charges, the 180-day speedy trial period contained in Article III is the operative time provision. *See, e.g., Baylor v. United States, supra,* 500 A.2d at 1015 n.12; *United States v. Bailey, supra,* 495 A.2d at 757–58; *Shewan v. State,* 396 So.2d 1133, 1133–34 (Fla.Ct.App.1981); *State v. Mason, supra,* 90 N.J.Super. at 473, 218 A.2d at 163. *But see McBride v. United States, supra,* 393 A.2d at 127 n. 3 (sug-

---

6. Although the government has maintained that the Act does not apply in the instant case, its argument is based on different reasons than those asserted in *Mauro. See United States v. Mauro, supra,* 436 U.S. at 363–64, 98 S.Ct. at 1848–49.

gesting in dicta that prisoner who filed request for final disposition and was subsequently transferred pursuant to writ of habeas corpus *ad prosequendum* may have right to be tried within 120 days of transfer). This is because while the government's filing of a detainer is a necessary prerequisite for any invocation of the Act, the Act's speedy trial provisions are only triggered when a request for final disposition is made. *Cf. Price v. State,* 237 Ga. 352, 356, 227 S.E.2d 368, 370–71 (1976) (where prisoner requested final disposition of charges, subsequent final disposition request by prosecutor not effective to invoke Article IV).

■■■ Accordingly, we hold that the 180-day limitation applies whenever the prisoner initiates the request for a final disposition of charges, irrespective of the means by which custody of the prisoner is obtained. Since the government brought appellant to trial within 180 days of the date it received his request for a final disposition of charges, we conclude that appellant's rights under the IAD were not violated.

### IV

Having found that the 180-day time limit contained in Article III was the provision triggered in appellant's case, we are not obliged to address the question of whether the 120-day speedy trial provision contained in Article IV was violated here. We briefly turn to this issue, however, because of the important question that it presents: whether the delays which resulted in appellant's trial being postponed beyond the 120-day deadline constituted continuances for "good cause" within the meaning of Article IV(c).

The record reflects that during the period between appellant's arrival in the District of Columbia from New York and the commencement of his trial, the government, the defense, and the trial court were

all operating on the understanding that Article IV, not Article III, was the IAD provision in effect.[7] Accordingly, they believed that the government was required to bring appellant to trial within 120 days of May 18, 1983, the date appellant arrived in the District of Columbia Jail from Ossining Correctional Facility. However, as stated previously, appellant's trial did not commence until September 23, which was 129 days after appellant's arrival in the District of Columbia. According to the record, this delay was due to the trial judge's full calendar for the month of September.

The government now argues that notwithstanding their failure to meet the 120-day speedy trial deadline, appellant's rights under Article IV were not abrogated because the delay in commencing appellant's trial was attributable solely to court congestion, and court congestion constitutes "good cause" for extending the 120-day period.

Numerous courts have addressed the question of whether and when court congestion is a "good cause" basis for the trial court's grant of a continuance under the IAD. A majority of these decisions have found that while a crowded court calendar may constitute good cause for a continuance, it does not automatically amount to good cause. Thus, under the generally accepted view, before the trial court may delay a trial beyond the time limits set out in Articles III or IV because of calendaring difficulties, there must be some showing that the trial judge attempted to take steps to have the trial commence in a timely fashion. *See, e.g., Brown v. Wolff,* 706 F.2d 902, 906 n. 8 (9th Cir.1983); *United States v. Ford,* 550 F.2d 732, 743 (2d Cir. 1977), *aff'd sub nom. United States v. Mauro,* 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978); *People v. Bell,* 669 P.2d 1381, 1386 n. 3 (Colo.1983); *People v. Forrest,* 72 Mich.App. 266, 273, 249 N.W.2d 384, 388 (1976); *State ex rel. Hammett v.*

---

**7.** On appeal, the government obviously changed their position regarding this issue. Now they contend that the 180-day provision applies.

*McKenzie,* 596 S.W.2d 53, 58–59 (Mo.App. 1980) (en banc); *State v. Aaron,* 102 N.M. 187, 191, 692 P.2d 1336, 1340 (1984); *People v. Miller,* 34 N.Y.2d 336, 337–338, 357 N.Y.S.2d 457, 458, 313 N.E.2d 761, 762 (1974); *compare People v. Watson,* 650 P.2d 1340, 1343 (Colo.App.1982) (continuance because trial judge was ill held to be for good cause); *Commonwealth v. Carillo,* 5 Mass.App.Ct. 812, 813, 361 N.E.2d 415, 416 (1977) (continuance because of scheduling difficulties due to imminent end of annual court term held to be for good cause). *But see United States v. Methven,* 547 F.2d 896 (5th Cir.1977).

In construing the Act's "good cause provision," courts have insisted that any continuance be granted "in open court" in the presence of either the defendant or his counsel as required by the Act. *See, e.g., Baylor v. United States, supra,* 500 A.2d at 1015; *United States v. Ford, supra,* 550 F.2d at 743. Certain courts have also interpreted the Act's language as contemplating that the granting of continuances for "good cause" only be made upon an express prosecutorial or defense motion for such a continuance, and may not be initiated by the trial judge. *See, e.g., People v. Sevigny,* 679 P.2d 1070, 1076 (Colo.1984) (en banc). *But cf. Baylor v. United States, supra,* 500 A.2d at 1015 n. 14 (rejecting argument that under IAD requests for continuance can only be made by prosecutor). This strict construction approach, *see United States ex rel. Holleman v. Duckworth,* 592 F.Supp. 1423, 1426 (N.D. Ill.1984), *reversed on other grounds,* 770 F.2d 690 (7th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 828, 88 L.Ed.2d 200 (1986), arises from the recognition that, because the government, through its agents, controls the procedural aspects of the Act, and because the IAD's underlying purpose is to promote the best interests of the prisoner by preventing abuses in the detainer system, the Act's provisions must be liberally construed so as to effectuate its purposes. *See McBride v. United States, supra,* 393 A.2d at 128; *Pittman v. State,* 301 A.2d 509, 513 (Del.1973); *see also Cuyler v. Adams,* 449 U.S. 433, 448–50, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981).

■ Accordingly, we take this opportunity to advise that while a crowded trial court calendar may in some circumstances constitute good cause for granting reasonable and necessary continuances under the IAD, it does not amount to *per se* good cause. Otherwise, in these times of chronic court congestion, the "good cause" exception could eviscerate the Act's speedy trial provisions. We recognize that because of serious scheduling conflicts it may not always be possible to accommodate the time limits imposed by the Act. Nevertheless, efforts must be made to adjust the court's calendar so as to commence trial proceedings in a timely fashion before continuances are granted due to court congestion. Similarly, because of the nature of the time limits imposed by the Act, and the severe consequences when those time constraints are not met, it is advisable in cases where the IAD speedy trial provisions are in effect for the trial court not to schedule a trial for the very last date available.

### V

In conclusion, we have reviewed appellant's claims and find that his rights under the IAD were not violated.[8] We, therefore, hold that the trial court did not err in denying the motion to dismiss appellant's indictment for noncompliance with the IAD.

*Affirmed.*

---

**8.** We summarily reject as without merit appellant's other two contentions that: (1) the trial court erred in admitting evidence of other crimes committed by appellant, and (2) that appellant was unduly prejudiced by certain remarks made by the prosecutor during closing argument. First, under the circumstances, evidence of a prior robbery was properly admissible as *Drew* evidence going to the question of *modus operandi. See Drew v. United States,* 118 U.S.App.D.C. 11, 16, 331 F.2d 85, 90 (1964). Second, upon review, we cannot say that the prosecutor's remarks during closing argument—asking the jury to effectuate "justice"—were inflammatory or improper.