Michael SWANIGAN, Appellant,

v.

UNITED STATES, Appellee.

No. 03–CO–449.

District of Columbia Court of Appeals.

Submitted Feb. 26, 2004.
Decided July 15, 2004.

Stephen Anthony Jackson, was on the brief for appellant.

Roscoe C. Howard, Jr., United States Attorney at the time, and John R. Fisher, Elizabeth Trosman, Karen D. Miller, and Heather R. Phillips, Assistant United States Attorneys, were on the brief for the United States.

Before STEADMAN, SCHWELB and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

While he was serving a prison sentence in Virginia, appellant Michael Swanigan made a request under Article III of the Interstate Agreement on Detainers (IAD) for a final disposition of charges that were pending against him in Superior Court of the District of Columbia. When, despite his request, Swanigan was not brought to trial within the 180–day period specified by the IAD, he moved to dismiss his indictment in this jurisdiction with prejudice. The trial court denied the motion, concluding that the IAD did not apply to Swanigan's case because he had finished serving his sentence in Virginia before he was returned to the District of Columbia for trial. The sole issue presented by this appeal is whether that ruling was correct.

We affirm the trial court's decision. The IAD did not require that Swanigan be brought to trial in the District of Columbia within 180 days of his request, we hold, because Swanigan finished serving his Virginia prison sentence before the 180–day period expired.

## I.

On the afternoon of October 2, 2001, Michael Swanigan and his co-defendant Robert Bailey fled in a station wagon from the scene of an armed robbery at a pawn shop in Alexandria, Virginia. As Swanigan drove the station wagon into the District of Columbia, Bailey leaned out of the passenger side window and fired several gunshots at police officers pursuing them. The chase ended when Swanigan ran a red light and collided with another vehicle, seriously injuring its occupant. Swanigan and Bailey were arrested at the site of the crash.

Swanigan was held in the D.C. Jail until October 17, 2001, at which time he was transferred to the Alexandria City Jail. There he remained until September 25, 2002, serving a one-year sentence on the Virginia charges of acting as an accessory after the fact and eluding a police officer in connection with the pawn shop robbery.

In the meantime, Swanigan was charged by complaint in District of Columbia Superior Court with the offense of assault on a police officer. Because he was incarcerated in Virginia, Swanigan did not appear for his October 26, 2001, preliminary hearing, and the Superior Court issued a bench warrant with a $1,000 cash bond "to serve as a detainer" against him at the Alexandria jail.

Five months passed. On March 29, 2002, Swanigan sent a letter asking the warden of the Alexandria City Jail to request that he be returned to the District of Columbia pursuant to the IAD to face the charges pending against him there. The Sheriff's Office in Alexandria transmitted Swanigan's request to the United States Attorney for the District of Columbia and the Superior Court Clerk's Office by certified mail on or about April 11, 2002. A few days later, Swanigan filed a motion in Superior Court to modify his bond status to personal recognizance because the District of Columbia detainer rendered him ineligible to participate in an in-patient drug treatment program in Virginia. The government opposed this motion and it was denied.

On June 19, 2002, a seven-count indictment was filed in Superior Court charging Swanigan with aggravated assault while armed, two counts of assault on a police officer with a dangerous weapon, and related firearms offenses. Thereafter, on July 31, 2002, the United States Attorney's Office served a writ of habeas corpus *ad prosequendum* on the warden of the Alexandria City Jail, asking that Swanigan be delivered to the District of Columbia for an arraignment on September 12, 2002. The writ was not honored,[1] however, and Swanigan remained in the Alexandria jail through September 24, 2002, the date on which his Virginia sentence terminated. The next day Swanigan was transferred to the District of Columbia Jail pursuant to the October 26, 2001, bench warrant that had been lodged as a detainer.

Swanigan was arraigned in Superior Court on September 26, 2002. At a proceeding the following day, his counsel asked the court to honor Swanigan's right under the IAD to be tried within 180 days after the United States Attorney's Office received his IAD demand letter—that is, approximately speaking, within 180 days of April 11, 2002, or no later than October 8, 2002.[2] The prosecutor opposed setting trial that soon and argued that the expedited trial requirements of the IAD did not apply because Swanigan had been brought to the District of Columbia at the end of his Virginia sentence and not pursuant to the writ of habeas corpus *ad prosequendum.* Agreeing with the prosecutor, the trial court scheduled trial for December 3, 2002.

On October 22, 2002, Swanigan moved to dismiss his indictment with prejudice because the government had failed to bring him to trial within the 180–day time frame specified by the IAD. The court denied the motion, ruling that even though Swanigan had made a timely Article III demand, "he was not returned to the District of Columbia pursuant to that demand because he had already completed his [Virginia] sentence and therefore his IAD rights were not implicated." Reserving his right to challenge that ruling in an appeal to this court, Swanigan pleaded guilty to aggravated assault in exchange for the dismissal of the other charges. *See* Super. Ct.Crim. R. 11(a)(2).

## II.

Whether the trial court should have dismissed Swanigan's indictment turns on the proper interpretation of the IAD, an interstate compact to which the United States, the District of Columbia,

---

1. Virginia authorities reportedly did not execute the writ because they expected Swanigan to be released from jail in Alexandria before his arraignment was scheduled to be held.

2. In the trial court Swanigan averred that the United States Attorney's Office had received his IAD demand on April 16, 2002, which would mean that the 180–day period ended on October 13, 2002. The difference is immaterial, and we shall disregard it.

and forty-eight States including the Commonwealth of Virginia are parties. *See* D.C.Code § 24–801 (2001); Va.Code Ann. § 53.1–210 (2002). The question before us is one of federal law, *see Alabama v. Bozeman*, 533 U.S. 146, 149, 121 S.Ct. 2079, 150 L.Ed.2d 188 (2001), as to which our review is de novo. *See United States v. Hall*, 974 F.2d 1201, 1204 (9th Cir.1992).

▆▆▆ The provisions of the IAD become applicable when a detainer is lodged against a prisoner in one State based on outstanding criminal charges in another State. A "detainer" is simply a "notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction." *United States v. Mauro*, 436 U.S. 340, 359, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978) (internal quotation marks and citation omitted). The lodging of a detainer does not, in itself, require the immediate transfer of the prisoner from one State to another; rather, it merely "requires a State in which an individual is currently imprisoned to hold that individual when he has finished serving his sentence so that he may be tried by a different State for a different crime." *Bozeman*, 533 U.S. at 148, 121 S.Ct. 2079.

In response to problems arising "for the most part [from] the [potentially] lengthy duration of detainers," *Mauro*, 436 U.S. at 360, 98 S.Ct. 1834, the IAD was adopted. As stated in Article I of the IAD, the prolonged pendency of detainers based on untried charges in other jurisdictions, and the "difficulties in securing speedy trial" on such charges, tended to "produce un-

certainties which obstruct programs of prisoner treatment and rehabilitation." D.C.Code § 24–801, Art. I. *See Tucker v. United States*, 569 A.2d 162, 167 (D.C. 1990) ("The IAD aims to protect prisoners both from harassment resulting from the filing of detainers based on groundless charges ... and from interference with the prisoner's rehabilitation program because of outstanding charges in another state.").[3] To address such problems, the IAD establishes procedures "to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints." D.C.Code § 24–801, Art. I. The procedures include a mechanism whereby a prisoner against whom a detainer has been filed can ask to be "transferred to a second jurisdiction for expedited disposition of the outstanding charges." *Felix*, 508 A.2d at 104.

Swanigan invoked this mechanism, which is set forth in Article III of the IAD. In pertinent part, Article III provides:

Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party State, and whenever during the continuance of the term of imprisonment there is pending in any other party State any untried indictment, information, or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred and eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prose-

---

**3.** "[D]etainers can have other detrimental effects on a prisoner's treatment aside from the negative impact they may have on a prisoner's ability to participate in a designated rehabilitation program." *Felix v. United States*, 508 A.2d 101, 106 (D.C.1986). "For example, because of outstanding detainers an inmate may be classified as a maximum or close custody risk, ineligible for certain work assignments, denied preferred living accommodations, deemed ineligible for work release programs, or denied the possibility of parole." *Id.; see also Carchman v. Nash*, 473 U.S. 716, 730 n. 8, 105 S.Ct. 3401, 87 L.Ed.2d 516 (1985); *Mauro*, 436 U.S. at 359, 98 S.Ct. 1834.

cuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information, or complaint; provided, that, for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance....

D.C.Code § 24–801, Art. III(a).[4] The remedy for a State's failure to comply with its expedited trial obligations under this Article is specified in Article V of the IAD: "In the event that an action on the indictment, information, or complaint on the basis of which the detainer has been lodged is not brought to trial within the period provided in Article III ... hereof, the appropriate court of the jurisdiction where the indictment, information, or complaint has been pending shall enter an order dismissing the same with prejudice, and any detainer based thereon shall cease to be of any force or effect." *Id.*, Art. V(c).

Swanigan "entered upon a term of imprisonment" in Virginia, a "detainer" was lodged against him based on an "untried complaint" in the District of Columbia, and he "caused to be delivered to the prosecuting officer [the United States Attorney's Office] and the appropriate court [Superior Court]" a proper request pursuant to Article III for a final disposition of the underlying charges within 180 days. Swanigan was not brought to trial within that time period. It is not contended that "good cause [was] shown in open court" for any continuance. Nonetheless, we do not agree with Swanigan that the trial court

should have dismissed his indictment with prejudice on account of the failure to try him by the Article III deadline.

Article III requires charges to be brought to trial within 180 days if the charges are pending "during the continuance of the term of imprisonment." D.C.Code § 24–801, Art. III(a). We interpret this to mean that if the term of imprisonment is discontinued before the 180–day period has run, the requirement of an expedited trial on the charges pending at that time ceases to exist. *Accord, State v. Holley*, 82 Md.App. 381, 571 A.2d 892, 896 (Spec.App.1990) ("[W]e hold that the I.A.D. does not apply to a prisoner whose term of imprisonment in a sister state ends prior to the expiration of 180 days after the State's Attorney receives a request for final disposition of the pending indictment, information or complaint from the prisoner.").[5] Swanigan's term of imprisonment in Virginia concluded on September 24, 2002, which at most was only 166 days into the applicable time period.[6] As of that date, Swanigan's Article III expedited trial right had not been violated; after that date, by our reading, Article III no longer furnished Swanigan a right to an expedited trial.

We construe Article III in accordance with its purpose. That Article of the IAD empowers a prisoner to demand an expedited trial on charges underlying a detainer "prior to the termination of his sentence in the sending State" so that the detainer can be dislodged and no longer interfere with the prisoner's "ongoing prison term." *Bozeman*, 533 U.S. at 148, 121 S.Ct. 2079.

---

**4.** Other provisions of Article III not in issue here specify, *inter alia*, the manner in which the prisoner is to make his request and the responsibility of the official having custody of the prisoner to forward the request to the appropriate prosecuting official and court. *See* D.C.Code § 24–801, Art. III(a)–(c).

**5.** *See also State v. Burnett*, 351 N.J.Super. 222, 798 A.2d 96, 99 (App.Div.2002); *Cunningham v. State*, 341 Ark. 99, 14 S.W.3d 869, 871 (2000). *But see Snyder v. Sumner*, 960 F.2d 1448, 1453 (9th Cir.1992).

**6.** The 180–day period began to run no earlier than April 11, 2002.

That purpose evaporates when the prisoner completes his prison term and is released from incarceration in the sending state. When a prisoner is within 180 days of the end of his incarceration, therefore, there is no longer any reason for the IAD to impose a 180–day trial deadline on the receiving State. At that point, imposition of such a deadline would not further the IAD's purposes. For example, Swanigan complained that the detainer made him ineligible to partake of an inpatient drug treatment program while he was imprisoned in Virginia. But by the time Swanigan made his Article III demand, he was less than 180 days from the end of his Virginia prison sentence. He was so near the end of his term of imprisonment that he could have been tried in 180 days and still have been unable to dislodge his detainer in time to take advantage of the inpatient program. Under those circumstances, the goals of the IAD would not have been furthered by imposing the 180–day deadline on the District of Columbia.[7]

On the other hand, had Swanigan made his demand earlier, he might have obtained some measure of relief, as the IAD contemplates. In that case, by requiring the District of Columbia to bring him to trial in 180 days, he could have dislodged his detainer before he completed his Virginia prison sentence. Then he would have been both eligible and able to participate in the inpatient program. As this illustrates, a prisoner seeking to benefit from Article III of the IAD is well advised to request final disposition of charges underlying a detainer more than 180 days before the end of his term of incarceration. If the prisoner waits too long to make that request, he will be unable to compel a trial in time to secure the benefits that the IAD was designed to provide.

Our construction of Article III is supported by the phraseology used throughout the IAD. For example, the IAD provides that the paperwork accompanying a prisoner's expedited trial request must state "the time remaining to be served on the [prisoner's] sentence." D.C.Code § 24–801, Art. III(a). In response to a prisoner's request, the State in which the outstanding charges are pending is expected to obtain only "temporary custody" of the prisoner. Id., Art. V(a). "For all purposes other than that for which temporary custody as provided in this agreement is exercised, the prisoner shall be deemed to remain in the custody of and subject to the jurisdiction of the sending State...." Id., Art. V(g).[8] "At the earliest practicable time consonant with the purposes of this agreement, the prisoner shall be returned to the sending State." Id., Art. V(e). The IAD envisions "the return of the prisoner to the original place of imprisonment," id., Art. III(d), or at least "to the territory and custody of the sending State...." Id., Art. V(h). These provisions evince no expectation that IAD trial deadlines will apply to prisoners whose sending State sentences of imprisonment have terminated. Significantly, the IAD makes no explicit provision for such prisoners.

We conclude that the 180–day deadline of Article III did not apply here because Swanigan finished serving his Virginia prison sentence before the 180–day period expired. A prisoner who wishes to avail himself of Article III's expedited trial re-

---

7. Released prisoners may, of course, have the same interests in receiving a speedy trial on outstanding criminal charges as other defendants who are not serving a prison sentence. Those interests are addressed and vindicated not by the IAD but by the Constitution and, in some jurisdictions, by legislation.

8. "During the continuance of temporary custody," moreover, "time being served on the sentence shall continue to run...." Id., Art. V(f).

quirement must cause his demand to be delivered more than 180 days before the end of his term of imprisonment. The trial court therefore properly denied Swanigan's motion to dismiss his indict-

ment with prejudice.[9] Swanigan's guilty plea stands and we affirm his conviction.

---

**9.** For the first time on appeal, Swanigan has advanced a second reason why the trial court should have granted his motion to dismiss. Swanigan contends that Virginia violated Article IV(a) of the IAD when it did not honor the writ of habeas corpus *ad prosequendum* from the United States Attorney's Office after thirty days. *See* D.C.Code § 24–801, Art. IV(a) ("[T]here shall be a period of thirty days after receipt by the appropriate authorities before the request be honored, within which period the Governor of the sending State may disapprove the request for temporary custody or availability."). Aside from the fact that Swanigan failed to preserve this contention for review by raising it first in the trial court, it is without merit in any event. In the first place, the requirements of Article IV apply only when it is the receiving State that has initiated the prisoner's transfer. Those requirements are inapplicable when, as in this case, the prisoner previously has made a transfer request under Article III. *See Felix*, 508 A.2d at 106–08. Furthermore, the provision of Article IV(a) that Swanigan cites imposes no time requirement that could bar his prosecution in this jurisdiction. Article IV(d) specifically states that a prisoner may not oppose his delivery to a receiving State "on the ground that the executive authority of the sending State has not affirmatively consented to or ordered such delivery." D.C.Code § 24–801, Art. IV(d).