Andre COOPER, Appellant,

v.

UNITED STATES, Appellee.

No. 09–CF–209.

District of Columbia Court of Appeals.

Submitted Sept. 15, 2011.
Decided Sept. 29, 2011.

Thomas D. Engle, was on the brief, for appellant.

Ronald C. Machen Jr., United States Attorney, and Roy W. McLeese III, Mary B. McCord, Jonathan P. Hooks, Jeffrey Pearlman, and John P. Gidez, Assistant United States Attorneys, were on the brief, for appellee.

Before THOMPSON, Associate Judge, and PRYOR and NEBEKER, Senior Judges.

NEBEKER, Senior Judge:

On December 16, 2008, a jury found appellant Andre Cooper guilty of first-degree fraud, two counts of uttering, and two counts of first-degree theft as a result of his involvement in two transactions designed to obtain hardwood flooring by tendering fraudulent checks. The trial court first dismissed the charges with prejudice, but on motion of the government, reinstated them. On appeal, Cooper argues that his trial date was set after the 180–day time frame provided by the Interstate Agreement on Detainers (hereinafter "IAD") had lapsed, and therefore, the court should not have vacated its decision to dismiss the charges against him with prejudice. He also argues that there was insufficient evidence connecting him to the charges relating to one of the transactions (the December 14th delivery). We disagree and affirm.

## I.

Raymond Lynn is one of the owners of Cherokee Wholesalers, Inc. ("Cherokee"), a distributor of hardwood flooring products, and was the company's executive vice president for sales and marketing in 2004. In December 2004, two of the company's regular customers were D.C. Floors, Inc., in Washington, D.C., and Martin Floors, in Hyattsville, Maryland. On December 15, 2004, Linda Tax, one of Lynn's employees, took an order for hardwood flooring over the phone, to be delivered to a job site at 3618 11th Street, Northwest, Washington, D.C. The charge for the product was $6,274.80. The person identified himself as "Frank" from D.C. Floors. Tax thought there was something "messed up" about the order because she had taken an order for delivery of hardwood floors to the same address a couple of days earlier. She notified Lynn of her concern.

Lynn contacted Metropolitan Police Department (hereinafter "MPD") Detective Vince Tucci, a detective with MPD's Financial Crimes and Fraud Unit. The detec-

tive organized a sting operation. On December 16, 2004, Cherokee's inventory manager, Larry Parks, drove the hardwood flooring to the requested address. Although he repeatedly knocked on the door of 3618 11th Street, no one answered the door. Parks then called the number on the invoice, 202–550–9267, and the man who responded said he would be there shortly. Thereafter, a man walked down the street toward Parks. Parks recognized the man as having the same voice as the person he talked to on the phone. The man, later determined to be appellant Andre Cooper, gave Parks a check for the flooring, and the signed the invoice as "Wesley." Cooper directed Parks to offload the flooring into an alley. After taking a few cartons of the flooring off of the truck, Parks notified Detective Tucci that the delivery had been completed. Moments later, the police apprehended Cooper and his cellular telephone ("cell phone") was seized. Parks gave the check and the invoice to Detective Tucci. Cooper was released on personal recognizance.

Several months later, Lynn met with Detective Tucci and an Assistant United States Attorney to review other invoices Lynn suspected were related to fraudulent transactions. There was an invoice dated December 13, 2004, for a delivery made on December 14, 2004, to the same address as the December 16th delivery. "Frank" also placed this request and told Cherokee that he was calling from Martin Floors. Shortly thereafter, "Frank" called again, and placed an additional order for hardwood flooring, to be delivered to the same address. On this day, "Frank" provided a Maryland number (301–526–9423) as the contact number for the invoice. The combined bill for the two orders was $5,567.50.

When the flooring was delivered on the 14th, the man who accepted the delivery signed both invoices as "Wesley." The man also gave the Cherokee delivery person a check for the amount due, which was later returned for insufficient funds.

It should be pointed out that Detective Tucci and the MPD handled the search of the cell phone in a commendable way. Detective Tucci seized Cooper's cell phone on the 16th. Instead of immediately accessing the cell phone's memory bank for evidence, the detective first obtained a warrant to search its memory bank. After obtaining a search warrant, the detective accessed the seized phone's memory bank and telephone records, and the telephone records of the Maryland phone number that was associated with the December 13, 2004, order. We need not pass judgment on whether the search warrant was required to search the cell phone seized incident to an arrest as no issue is presented on appeal regarding the denial of appellant's motion to suppress. *See generally State v. Carroll,* 322 Wis.2d 299, 778 N.W.2d 1 (2010) (for the decision of a plethora of issues relating to proof of criminality by cell phone).

The records reveal an incriminating tapestry of cell phone calls which demonstrate how this method of communication has changed not only the way fraud can be perpetrated, but how it can be detected. It seems that in the time of exclusive land telephone lines nothing short of a warranted wire tap could have broken this scheme and allowed successful prosecution.[1]

The records divulge a series of calls between Cooper's 202 phone, the Maryland number, and Cherokee around the same

---

1. One may question whether, given present day electronic data storage capacity, such data stored in a cell phone would, in any event, be subject to the inevitable discovery exception to the exclusionary rule since the identical data is stored in the cell phone provider's data bank for billing and other purposes.

approximate times the orders were placed and flooring delivered. The morning of December 14th, Cooper's cell phone was used to call Cherokee three times, and it was used to call Cherokee numerous other times between December 15th and 16th. Cooper's cell phone was also used to call the Maryland number four times on December 13th, and twenty times on December 14th. The Maryland number called Cooper's cell phone nineteen times on December 13th, and thirty-one times on December 14th. Many of the calls between Cooper's cell phone and the Maryland cell phone were interspersed with calls to Cherokee. The telephone records also establish that on December 15th, Cooper called the Maryland number three times, coinciding with the times Cooper called Cherokee. The Maryland number called Cooper's number thirteen times that same morning. On the 16th, Cooper called the Maryland number eight times. Cooper also called the Maryland number many times shortly after he was stopped by the police.

## II.

Cooper "freely concedes that the government had sufficient proof" to establish that he was involved with the December 16, 2004 transaction, received the delivery, used a cell phone to communicate with the delivery person, tendered a fraudulent check, and received the hardwood flooring. He argues, however, that there is insufficient proof of his participation in the December 14, 2004 transaction. He contends that "[s]imply because he had a tool of the scheme—one of the two cell phone[s]—on December 16th does not mean he had the phone earlier or participated in the December 14th offense."

■■■ In evaluating a claim of evidentiary sufficiency, we "view the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Graham v. United States*, 12 A.3d 1159, 1163 (D.C.2011) (citation and quotation marks omitted). Moreover, we draw "no distinction between direct and circumstantial evidence." *Id.* (quoting *Williams v. United States*, 881 A.2d 557, 566 (D.C. 2005)). Furthermore, "[t]he evidence need not 'compel a finding of guilt beyond a reasonable doubt,' and it need not 'negate every possible inference of innocence.'" *Napper v. United States*, 22 A.3d 758, 770 (D.C.2011) (quoting *Timberlake v. United States*, 758 A.2d 978, 980 (D.C.2000)). "To prevail on an insufficiency claim, an appellant must establish 'that the government presented no evidence upon which a reasonable mind could find guilt beyond a reasonable doubt.'" *Carter v. United States*, 957 A.2d 9, 14 (D.C.2008) (quoting *Peery v. United States*, 849 A.2d 999, 1001 (D.C.2004)). In other words, reversal is warranted "if the evidence . . . is such that a reasonable juror *must* have a reasonable doubt as to the existence of any of the essential elements of the crime." *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (citation and quotation marks omitted).

■■■ "A person commits the offense of fraud in the first degree if that person engages in a scheme or systematic course of conduct with intent to defraud or to obtain property of another by means of a false or fraudulent pretense, representation, or promise and thereby obtains property of another or causes another to lose property." D.C.Code § 22–3221(a) (2001). To " '[u]tter' means to issue, authenticate, transfer, publish, sell, deliver, transmit, present, display, use, or certify [a forged written instrument]." D.C.Code § 22–3241(a)(2) (2001). The intent to defraud is an essential element of uttering a forged

written instrument. D.C.Code § 22–3241(b) (2001). A defendant's intent to defraud, "under proper circumstances, may be inferred from the presentment of a forged instrument." *Ashby v. United States,* 363 A.2d 685, 687 (D.C.1976). Finally, "[a] person commits the offense of theft if that person wrongfully obtains or uses the property of another with intent: (1)[t]o deprive the other of a right to the property or a benefit of the property; or (2)[t]o appropriate the property to his or her own use or to the use of a third person." D.C.Code § 22–3211(b) (2001). If the theft involves property valued at $250 or more, then it is first degree theft. D.C.Code § 22–3212(a) (2001).[2]

██ Here, the jury had sufficient evidence from which a reasonable jury could conclude that Cooper was not only connected to the December 16th incident, but also the December 14th transaction. Cooper possessed the 202 cell phone on December 16th, and the billing address of the phone was the same address where he was living. A jury could reasonably infer that Cooper possessed the same cell phone a mere two days earlier, especially because the cell phone's billing address was the same as his residence at that time.

Furthermore, a jury could conclude that Cooper was linked to the December 14th transaction based on the telephone records of his cell phone and the Maryland cell phone. The records establish that there were many phone calls made between Cooper's cell phone, the Maryland cell phone, and Cherokee between December 13th and 14th. Moreover, the calls between the Maryland number and Cooper's number were interspersed with calls to Cherokee.

There are also many similarities between the two transactions. "Frank" placed both orders. Both orders also requested the hardwood flooring to be delivered to the same address. Cherokee delivered to a person on both days who signed the invoices as "Wesley," and the signatures were similar. From all of this evidence, a reasonable jury may conclude that Cooper was involved in the December 14th transaction.

## III.

██ When the D.C. Superior Court called this case for arraignment, Cooper did not appear because he was incarcerated in Virginia, and the Superior Court issued a bench warrant. Thereafter, pursuant to the IAD, Cooper made a demand for a final disposition of the charges against him in the D.C. Superior Court. Cooper delivered his demand to the appropriate prison official on May 5, 2008. On May 7, 2008, the Detainer Coordinator for the Commonwealth of Virginia sent Cooper's demand to the United States Attorney's Office for the District of Columbia (hereinafter "USAO").[3] The USAO mail room received the letter on May 12, 2008. All parties conferred, and the trial court scheduled trial to take place on November 6, 2008.

On the day of the trial, the trial court *sua sponte* questioned whether Cooper had been brought to trial within the 180–day time frame set forth in the IAD. Cooper moved to dismiss his indictment with prejudice for an IAD violation, and the trial court granted his motion. The court ruled that the 180 days began to run on

---

**2.** In 2009, the statute was amended to increase the property value of first degree theft to $1,000 or more. D.C.Code § 22–3212(a) (2001) (2011 Supp.).

**3.** Cooper incorrectly asserts that his demand was sent on May 5, 2008. To the contrary, Ms. Ward's letter to the USAO is dated May 7, 2008. The letter was postmarked May 8, 2008.

May 5, 2008, the day Cooper delivered his demand to the Virginia prison official. The government filed a motion for reconsideration that same day and cited *Fex v. Michigan,* 507 U.S. 43, 113 S.Ct. 1085, 122 L.Ed.2d 406 (1993) in support of its argument that the 180–day period does not begin to run until the prisoner's demand has been delivered to the prosecuting officer. The trial court granted the government's motion and reinstated the case.

 We review the denial of a motion to dismiss an indictment under the IAD *de novo, Swanigan v. United States,* 853 A.2d 742, 745 (D.C.2004), and defer to the trial court's factual findings unless they are clearly erroneous. *See United States v. Hall,* 974 F.2d 1201, 1204 (9th Cir.1992). "[T]he IAD establishes procedures for the transfer of a person who has 'entered upon a term of imprisonment' from one jurisdiction to another jurisdiction for the disposition of a pending, untried indictment" in the second jurisdiction. *See* D.C.Code § 24–801, art. III(a) (2001); *Felix v. United States,* 508 A.2d 101, 103 (D.C.1986). The IAD states, in relevant part:

> Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party State, and whenever during the continuance of the term of imprisonment there is pending in any other party State any untried indictment, information, or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial *within one hundred and eighty days after he shall have caused to be delivered* to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information, or complaint.

D.C.Code § 24–801 art. III(a) (2001) (emphasis added). If a court fails to bring a prisoner to trial within 180 days, and good cause is not shown, then the IAD requires that the indictment be dismissed with prejudice. § 24–801 art. III(d). With regard to when the 180–day time frame begins to run, "delivery is the key concept." *Fex v. Michigan,* supra, 507 U.S. at 43, 49, 113 S.Ct. 1085. The 180–day period "does not commence until the prisoner's request for final disposition of the charges against him has actually been delivered to the court and prosecuting officer of the jurisdiction that lodged the detainer against him." *Id.* at 52, 113 S.Ct. 1085; *see also Fields v. United States,* 698 A.2d 485, 490 (D.C. 1997) (concluding that a prisoner's mere submission of an IAD request is insufficient to trigger the 180–day time-frame).

Here, Cooper's demand was delivered to the United States Attorney's Office on May 12, 2008.[4] The 180 days began to run on May 12, 2008, and would have expired on November 8, 2008. Cooper's November 6, 2008, trial date was within the IAD's 180–day period, and the trial court did not err in reconsidering it's dismissal and reinstating Cooper's indictment.[5]

---

4. The record is silent as to when, if ever, Cooper's demand was delivered to the District of Columbia Superior Court, but as noted, *supra,* the trial court was aware of the notice when it, *sua sponte,* raised the issue.

5. We are not persuaded by Cooper's attempt to differentiate his case from the Supreme Court's holding in *Fex.* He argues that in his case, the United States is the prosecuting officer, and therefore, the United States received his IAD demand when the United States Postal Service accepted his demand into the mail system. He states, "[a]t that point, he had served the federal government—the Postal Service is part of the executive branch of the United States Government." Cooper contends that his situation may be distinguished from *Fex* because there, the prosecuting offi-

Accordingly, the judgment of conviction is

*Affirmed.*

cial was the state and delivery was not completed until the federal postal service delivered the IAD to the state prosecutor.

Cooper cites no authority in support of his proposition, and we are not aware of any He

cannot show that the trial court erred in determining that the 180–day IAD time frame had not lapsed as of November 6, 2008.